686 P.2d 1224

**STATE of Arizona,**
**Appellee/Cross-Appellant,**

v.

**Alex L. GORTAREZ,**
**Appellant/Cross-Appellee.**

No. 5601.

Supreme Court of Arizona,
In Banc.

June 27, 1984.

Robert K. Corbin, Atty. Gen., William J. Schafer, III, Chief Counsel, Crim. Div., Michael D. Jones, Diane M. Ramsey, Gary A. Fadell, Asst. Attys. Gen., Phoenix, for appellee.

Alex L. Gortarez, in pro. per.

GORDON, Vice Chief Justice:

On March 25, 1982, a jury found appellant, Alex Gortarez, guilty of first degree conspiracy in violation of former A.R.S. § 13–331(A) [repealed by 1977 Session Laws, ch. 142, § 10]. He was sentenced to a term of not less than ten nor more than fifteen years. Timely appeal was filed from the conviction. The state timely filed a cross-appeal on an evidentiary matter. The appeal and cross-appeal were transferred to this Court from the Court of Appeals. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Ariz.R.S.Ct. 47(e)(1). We affirm the conviction. However, pursuant to A.R.S. § 13–4037, we modify appellant's sentence so that he is sentenced to imprisonment rather than to the Arizona Department of Corrections for

the above-mentioned term. *See State v. Gutierrez*, 130 Ariz. 148, 634 P.2d 960 (1981).

In the summer of 1978, the Phoenix Police Department was involved in an attempt to expose and arrest members of a large-scale heroin distribution scheme. Because of difficulties in infiltrating the distribution organization and in direct surveillance, several wiretap authorizations were sought and were granted. Over a period of several months, the taped conversations involving the purchase and sale of heroin were analyzed. After many of the voices were identified, the case was presented to the grand jury. On April 21, 1980, the grand jury returned a thirty-four count indictment naming twenty-one defendants. Appellant was named in two counts and charged with conspiracy to distribute heroin for sale and possession of heroin. The possession charge was dismissed on the state's motion prior to trial.

In appealing his conviction on the conspiracy count, appellant raised six issues:

(1) whether the trial court erred in denying his motion to dismiss or for a new probable cause determination;

(2) whether evidence obtained pursuant to wiretaps should have been suppressed;

(3) whether the admission into evidence of certain of the taped conversations obtained from the wiretap was reversible error;

(4) whether there was sufficient evidence to support the verdict;

(5) whether the jury was improperly coerced into reaching a verdict; and

(6) whether he received ineffective assistance of counsel.

The state's cross-appeal raised the additional issue of whether the trial court properly admitted spectrographic voice identification evidence.

Subsequent to filing his notice of appeal, appellant filed a petition under Ariz.R. Crim.P. 32 in the superior court. The petition, the essence of which was ineffective assistance of counsel, was denied. He peti-

tioned this Court to review that denial. Pursuant to Ariz.R.Crim.P. 31.4(b)(2), the petition to review the denial of the rule 32 petition was consolidated with the direct appeal and will be addressed herein.

## DENIAL OF MOTION TO DISMISS OR FOR NEW PROBABLE CAUSE DETERMINATION

Prior to trial, appellant moved to dismiss the conspiracy count or, in the alternative, to remand to the grand jury for a redetermination of probable cause. The basis of his motion was that the grand jury had heard perjured testimony regarding appellant's participation in the conspiracy. The state, in opposing this motion, acknowledged that the grand jury had received some misinformation but argued that the misrepresentation was not intentional. The trial court, after an evidentiary hearing, found that the misstatement was neither intentional nor motivated by malice, that appellant had suffered no prejudice from the misstatement, and that the motion was actually a challenge to the sufficiency of the evidence. Appellant's motion was denied.

To obtain review of the denial of a motion for a redetermination of probable cause, a defendant must seek relief via special action prior to trial. *State v. Verive*, 128 Ariz. 570, 627 P.2d 721 (1981). With one exception, review of matters relevant only to the grand jury proceedings cannot be sought by appeal from a conviction. *Id.* The one exception to this rule is when a defendant has had to stand trial on an indictment which the government knew was based partially on perjured, material testimony. *United States v. Basurto*, 497 F.2d 781 (9th Cir.1974). Appellant seeks to bring the instant case within this exception.

The misrepresentation at issue involved one of the overt acts with which appellant was charged. In relating to the grand jury the substance of the many taped conversations, Det. Richard Hogue inadvertently misidentified one speaker as appellant. At the evidentiary hearing, Det. Hogue explained how the mistake occurred.

One of the other people indicted with appellant was his brother, Johnny Gortarez. Early in their investigation, the police officers believed that Johnny Gortarez and Alex Gortarez were the same person. This misunderstanding was apparently due to the fact that the brothers sometimes used each other's name and sometimes used the same nickname. Det. Hogue explained the mistake as follows:

"Q. [by defense counsel]: What was your first answer?

"A. [by Det. Hogue]: Johnny Gortarez.

"Q. Now, did you reflect on it and say to the grand jury you were mistaken, that it was Alex Gortarez?

"A. Well, again, it was confusion on my part. I was testifying to the call as my testimony was that the call in question was a Johnny Gortarez call, which it was. I was [interrupted] by the County Attorney, who asked me if it was Johnny Gortarez or Alex Gortarez. This brought confusion upon me because of the hard time I had in identifying Johnny Gortarez and Alex Gortarez, which are two separate people. I had made a mistake on my chart, also had it listed as Johnny Gortarez. Then I testified I thought the confusion was that this was the Alex Gortarez conversation, and I testified to that.

"Q. It wasn't?

"A. No, it was a Johnny Gortarez conversation."

We agree with the trial court that the misstatement was not intentional or motivated by malice and hold that the *Basurto* exception is inapplicable to this matter. Because appellant has been found guilty of conspiracy beyond a reasonable doubt, we will not now review the finding of probable cause made by the grand jury.

## SUPPRESSION OF EVIDENCE OBTAINED BY WIRETAP

Prior to trial, appellant moved to suppress all evidence obtained by wiretaps authorized under former A.R.S. § 13–1057 [now A.R.S. § 13–3010]. His motion was

denied. He now asserts that the denial was error and advances several bases for that assertion.

■ Appellant's first argument is that our state wiretap statute is unconstitutional because it has a "less limited scope" than the federal wiretap statute, 18 U.S.C. § 2510 *et seq.* However, appellant cites no example of any specific disparity between the state and the federal statutes. Both divisions of our Court of Appeals have examined various alleged disparities between the statutes and, while acknowledging minor differences between them, have found the state statute to be sufficiently compatible with the federal one to ensure compliance with the federal standards. *See State v. Olea,* 139 Ariz. 280, 678 P.2d 465 (App. 1983); *State v. Politte,* 136 Ariz. 117, 664 P.2d 661 (App.1982). We agree with the analysis contained in those two opinions and uphold the constitutionality of the state statute.

■ Appellant's second argument is that the wiretap evidence was illegally obtained because there was no attempt to minimize the interception of communications not subject to interception under the court order. Initially, we note that appellant has no standing to challenge the validity of tapes of telephone calls to which he was not a party. *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *United States v. Jabara,* 618 F.2d 1319 (9th Cir.), *cert. denied sub. nom. Hood v. United States,* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980). Regarding those tapes to which he was a party, we find that there was considerable evidence of minimization and that former A.R.S. § 13–1057(D)(6) [now A.R.S. § 13–3010(D)(6) ] was satisfied. Appellant's primary contentions are that English-speaking police officers monitored the telephone calls and that, because the calls were primarily in Spanish and not contemporaneously translated, there was a greater intrusion than necessary or than allowed by the court-ordered authorization. The trial court held a lengthy hearing on appellant's motion to suppress. At that hearing, the

police officers involved in the monitoring testified that there was always a Spanish-speaking officer present to monitor the calls. The evidence also showed that, while sixty-two calls were intercepted on this wiretap, the recording of thirty-five of them was terminated because the calls were either personal or otherwise insignificant to the investigation. Given such evidence, we find no abuse of discretion in the trial court's denial of appellant's motion to suppress.

■ Appellant's final argument is that the affidavit in support of the wiretap which intercepted his calls did not mention his name and that it therefore violated his fourth amendment rights. Appellant was not a suspect at the time the authorization for the wiretap was sought or when it was issued. Only after the interception of the calls and the identification of the speakers did appellant become a suspect. The fact that his name was not included in the affidavit in support of the wiretap in no way infringes on his constitutional rights. *See United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *United States v. Kahn,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1975).

## ADMISSION OF THE RIVERA–ROBLES CONVERSATIONS

A composite tape containing four conversations between Benny Rivera and John Robles, two alleged co-conspirators of appellant, was admitted at trial over defense counsel's objections. Appellant contends that admitting this tape into evidence was error.

■ Appellant first argues that statements made by co-conspirators cannot be admitted unless it has been shown that a conspiracy exists and that both the defendant and the declarant are parties to it. We agree with this statement of the law. *See State v. Baumann,* 125 Ariz. 404, 610 P.2d 38 (1980). Appellant asserts that there was no independent evidence of his involvement in the conspiracy prior to the playing of the Rivera-Robles tape. We disagree.

The existence of a conspiracy to distribute heroin and the involvement of both Rivera and Robles had been presented to the jury through the testimony of Lynn Williams who was also a co-conspirator. Earlier admitted exhibits had demonstrated that a man nicknamed "Chayo" spoke with Rivera about acquiring heroin. Several witnesses, including appellant's common-law wife, had identified appellant as "Chayo." The telephone number called by Rivera when he spoke to "Chayo" had been shown to be that of appellant's residence. Cumulatively, this evidence is sufficient to show the involvement in the conspiracy of Rivera, Robles, and appellant. The admission into evidence of the Rivera-Robles tape was not error on this basis.

■■■ Appellant next asserts that the admission of the Rivera-Robles tape violated his sixth amendment right of confrontation. There is a two-pronged analysis in this state to evaluate confrontation clause claims. *State v. McCall*, 139 Ariz. 147, 677 P.2d 920 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). First, the declarant must be unavailable; second, the statement itself must be reliable. *State v. Martin*, 140 Ariz. 466, 679 P.2d 489 (1984). Appellant challenges the admission of the Rivera-Robles tapes on the basis of both prongs. He challenges the unavailability of Rivera.[1] The state called Rivera as a witness at appellant's trial. After stating his name, Rivera invoked his fifth amendment privilege to all other questions and indicated that he would continue to do so. At the time of the trial, Rivera had already been sentenced on charges arising out of this conspiracy and had filed a notice of appeal. Pending that appeal, Rivera still possessed his fifth amendment rights, *State v. Axley*, 132 Ariz. 383, 646 P.2d 268 (1982), and was legally unavailable. Appellant challenges the reliability of Rivera's and Robles' statements on the basis that two people nicknamed "Chayo" had been found during the investigation. This fact, he asserts, makes Rivera's and Robles' statements, and their

references to "Chayo," ambiguous and, therefore, unreliable. We disagree. The statements of Rivera and Robles were reliable under the test set forth in *Martin, supra*. The statements were properly admitted into evidence. The resolution of any ambiguities and the identification of "Chayo" were merely factual determinations for the jury.

## SUFFICIENCY OF THE EVIDENCE

■■■ Former A.R.S. § 13–333 [repealed by Session Laws 1977, ch. 142, § 10] required that, for conviction of conspiracy, at least one overt act be expressly alleged in the indictment and be proven at trial. Appellant contends that the overt acts alleged in his indictment and proven at his trial cannot support his conviction. We hold that former § 13–333 was complied with in appellant's case and that the evidence does sustain the verdict.

The indictment in this matter contained thirty-two pages of alleged overt acts. Four overt acts named appellant as a participant. Although one of these four overt acts was withdrawn by the state prior to trial, evidence of the other three was presented to the jury. As noted above, one co-conspirator, Lynn Williams, testified at appellant's trial concerning the nature of the conspiracy and the involvement of herself, Rivera, and Robles in it. The wiretapped conversations showed Rivera talking with "Chayo" about "Chayo's" need for heroin and arranging delivery to "Chayo" of a quantity of heroin usually possessed by a person for resale. The substance of these conversations made up the alleged overt acts of the indictment; proof of these acts was given at trial; the requirements of former § 13–333 were met. In addition, the testimony of several police officers and appellant's common-law wife support the jury's finding that "Chayo" is appellant. Sufficient evidence exists to support the guilty verdict.

1. Appellant does not challenge, and we do not consider, the unavailability of Robles.

## COERCION OF THE JURY

■ Appellant contends that "the trial court demanded that the jury reach a verdict" by giving the following instruction:

"All twelve of you must agree on a verdict. All twelve of you must agree whether the verdict is guilty or not guilty. When you go to the jury room you will choose a foreman who will be in charge during your deliberations and who will sign any verdict."

This precise instruction was approved by this Court in *State v. Thomas*, 133 Ariz. 533, 652 P.2d 1380 (1982). Furthermore, the above-quoted instruction was immediately preceded by an instruction that informed the jury members that they were not obligated to reach any verdict whatsoever:

"It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict."

There was no error in the trial court's giving these instructions.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant contends that he did not receive a fair trial because he was denied effective assistance of counsel. He points to three examples of what he maintains demonstrates less than the minimal professional competence required of counsel. *See State v. Watson*, 134 Ariz. 1, 653 P.2d 351 (1982).

■ Appellant first complains that his trial counsel did not object to the state's eliciting testimony from several police officer witnesses that they worked for the Organized Crime Bureau. Citing *State v. Wilson*, 134 Ariz. 551, 658 P.2d 204 (App. 1982), appellant argues that a motion for mistrial following the first testimony of this sort would have been granted. Appellant's reliance on *Wilson* is misplaced. In *Wilson*, the following testimony was elicited at trial:

"Q. In 1978 with what division were you with?

"A. Organized Crime Bureau.

"Q. As a result of working in that division, did you do any investigation into a company called Fruit Juice Corporation of Phoenix?

"A. I did."

134 Ariz. at 552, 658 P.2d at 205. Our Court of Appeals noted that:

"First, we note that the initial question, dealing with the fact that the investigator was with the Organized Crime Bureau was not improper. This question would enable a jury to better evaluate his testimony and the source of his knowledge. *State v. Brewer*, 26 Ariz. App. 408, 549 P.2d 188 (1976). The next question, suggesting that his investigation into the appellants' corporate activities was a result of being in the Organized Crime Bureau, is arguably no more harmful than the initial question."

*Id.* 134 Ariz. at 554–55, 658 P.2d at 207–08. We agree with these comments. In the instant case, appellant never contested the existence of an organized heroin distribution scheme. His defense was one of non-involvement and mis-identification. Thus, even if improper, the questions to the officers were not prejudicial.

■ Appellant's second complaint is that his trial counsel did not object when the state partially impeached one of its own witnesses. Impeachment of a party's own witness is allowed, Ariz.R.Evid. 607; any objections on this basis would have been futile.

■ Appellant's third complaint is that his trial counsel did not object to several police officers testifying as to their

opinion of whether "Chayo" and appellant were the same person. Appellant asserts that an improper foundation was laid to qualify the police officers as experts in voice identification. Initially, we note that there was no attempt to qualify any of the police officers as experts. Rather, they were offering their opinion as laymen. Ariz.R.Evid. 701 requires that such an opinion be rationally based on the witness' own perceptions, and, as the Ninth Circuit has stated:

> "[u]nder Fed.R.Evid. 901(b)(5), voice identification to determine the admissibility of recorded conversations may be made by one who has heard the voice 'at any time under circumstances connecting it with the alleged speaker.' Lay opinion on this issue is permissible so long as the witness testifying has this requisite familiarity with the speaker."

*United States v. Thomas,* 586 F.2d 123, 133 (9th Cir.1978) (footnote omitted) (requisite foundation found in Drug Enforcement Administration Agent's three prior telephone conversations with defendant). *See also United States v. Vitale,* 549 F.2d 71 (8th Cir.), *cert. denied,* 431 U.S. 907, 97 S.Ct. 1704, 52 L.Ed.2d 393 (1977) (requisite foundation found in police officer's two prior conversations with defendant); *United States v. DiMuro,* 540 F.2d 503 (1st Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977) (requisite foundation found in police officer's infrequent prior conversations with defendants); *United States v. Rizzo,* 492 F.2d 443, 448 (2d Cir.), *cert. denied,* 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 669 (1974) (requisite foundation found despite police officer's "minimal exposure" to defendant's voice); *see generally* 70 A.L.R.2d 995 (1960). The required familiarity with the speaker was met by each of the officers who testified. For example, Det. Guzzetta met appellant personally during the investigation, tape-recorded the conversation, and compared the tape with other known recordings of appellant and with the "Chayo" recordings. Based on his perceptions, he offered his opinion as to whether appellant was the "Chayo" on the tapes. Each of the officers related their opportunities to listen to appellant's voice and their methods of comparing appellant's voice with that of "Chayo." The necessary foundation for the testimony of each of the officers was laid. Appellant's trial counsel's failure to object was not inappropriate. Appellant has not shown that he received ineffective assistance of counsel.

## DENIAL OF THE RULE 32 PETITION

▆▆▆▆ In his petition filed pursuant to Ariz.R.Crim.P. 32, appellant alleged three grounds for post-conviction relief:

(1) that testimony before the grand jury was perjured;

(2) that he received ineffective assistance of counsel at trial; and

(3) that there had been an unconstitutional amendment of the indictment.

The superior court did not hold a hearing to consider appellant's claims. Rather, it denied the petition summarily based on its finding that each of the claims were properly preserved for appeal. Post-conviction relief via rule 32 may not be granted based on any claim which may still be raised on direct appeal pursuant to Ariz.R.Crim.P. 31 or on a post-trial motion pursuant to Ariz. R.Crim.P. 24. *See* Ariz.R.Crim.P. 32.-2(a)(1). The trial court's denial of the rule 32 petition was proper and is affirmed.

▆▆▆ Appellant's opening brief was filed in this Court ten months after the rule 32 petition was denied. The issues not raised in his brief to this Court must be considered waived. *State v. McCall, supra.* Those issues raised both in his rule 32 petition and in his appellate brief have already been addressed *ante.*

## ADMISSION OF "VOICEPRINT" EVIDENCE

Prior to his trial, appellant sought and was granted permission to introduce expert testimony concerning spectrographic comparisons of his voice with the tape-recorded voice of "Chayo." The state's cross-appeal challenges this ruling.

· The sound spectrograph is an electromagnetic instrument which analyzes sound and produces a graphic display of it in time, frequency, and intensity components. The display is called a sound spectrogram.[2] To produce a spectrogram, a magnetic tape loop containing a speech sample is placed in the spectrograph. The spectrograph electronically scans the tape and generates electronic signals which, through an electric stylus, are recorded onto electrically sensitive paper affixed to a rotating drum.

Spectrograms of a known voice and an unknown voice saying the same words are then compared visually to determine whether they were made by the same speaker. Though the spectrograms need not be identical, there must be a significant number of spectrographic patterns which match to warrant a conclusion that they were produced by the speech of the same person.[3]

■ This Court has recently reevaluated the test for admission of evidence obtained from the use of a scientific principle, theory, or discovery. *See State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982). In *Collins*, we reaffirmed this state's adoption of the rule first set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Under the *Frye* rule, expert testimony deduced from well-recognized scientific principles will be admitted only when "the thing from which the deduction is made [is] sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014. Thus, if the validity of a new scientific technique is in controversy in the relevant scientific community or if it is generally regarded as merely experimental, expert

testimony based on its validity cannot be admitted into evidence. *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978). The state challenges the trial court's finding that speech spectrograms have reached the required level of general acceptance in the scientific community to warrant their admission into evidence in criminal trials.

■ The threshold task in applying the *Frye* rule is to ascertain the particular scientific field to which spectrographic analysis belongs.

"[T]he court must be able to find that the procedure is generally accepted as reliable by the larger scientific community in which it originated." *People v. Shirley*, [31 Cal.3d 18, 54 n. 32, 181 Cal.Rptr. 243, 264 n. 32, 641 P.2d 775, 796 n. 32 (1982)]. We hold, therefore, that the *Frye* test is satisfied when the court is able to conclude that disinterested and impartial experts, knowledgeable in the scientific speciality which deals with and uses such procedures or techniques, have come to recognize the methodology as having sufficient scientific basis to produce reasonably uniform and reliable results that will contribute materially to the ascertainment of the truth."

*Collins, supra*, 132 Ariz. at 199, 644 P.2d at 1285. In the area of spectrographic analysis, we feel that disinterested and impartial experts in many fields, possibly including acoustical engineering, acoustics, communications electronics, linguistics, phonetics, physics, and speech communications, must generally accept the technique before we will allow its admission into evidence in this state.[4]

---

2. Speech spectrograms have often been called "voiceprints" leading to an unfortunate implication that they are similar to fingerprints. However, speech spectrograms are fundamentally different from fingerprints. Whereas the anatomical ridges in the skin are topologically invariant and remain essentially unaltered throughout a person's lifetime, repeated utterances of the same word by the same speaker are not acoustically invariant and change markedly with age. *See* Committee on Evaluation of Sound Spectrograms, National Research Council, *On the Theory and Practice of Voice Identification* 6, 59 (1979).

3. *See generally* A. Moenssens and F. Inbau, *Scientific Evidence in Criminal Cases* §§ 12.01–12.-05 (2d ed. 1978).

4. This list of relevant scientific fields is merely suggestive; it is not all-inclusive.

The Supreme Court of Indiana has suggested that the relevant scientific community should be made up of "linguists, psychologists, and engineers, in addition to the people who use voice spectrography for identification purposes." *Cornett v. State*, 450 N.E.2d 498, 503 (Ind.1983). The California courts suggest that experts in the

█ The next task in applying *Frye* is to determine whether spectrographic analysis has reached a level of "general acceptability" within this group. We have read numerous reports contained in the scientif-

ic literature and conclude that voice identification by spectrographic analysis does not at this time meet the *Frye* requirement of general acceptance in the relevant scientific community.[5]

fields of anatomy, medicine, physiology, psychology, phonetics, and linguistics should be included. *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976).

5. We do not attempt to summarize each of the many scientific reports and legal commentaries that we have reviewed. We merely list many of the more informative articles. They adequately demonstrate the lack of general acceptance of the reliability of spectrographic analysis. *See* Black, Lashbrook, Nash, Oyer, Pedrey, Tosi, and Truby, "Reply to 'Speaker Identification by Speech Spectrograms: Some Further Observations,'" 54 J.Acoust.Soc.Am. 535 (1973); Bolt, Cooper, David, Denes, Pickett and Stevens, "Speaker Identification by Speech Spectrograms: A Scientists' View of its Reliability for Legal Purposes," 47 J.Acoust.Soc.Am. 597 (1970); Bolt, Cooper, David, Denes, Pickett, and Stevens, "Speaker Identification by Speech Spectrograms: Some Further Observations," 54 J.Acoust.Soc.Am. 531 (1973); Boren, "Voiceprint—Staging A Comeback," 3 U.San Fern.V.L. Rev. 1 (1974); Cederbaums, "Voiceprint Identification; A Scientific and Legal Dilemma," 5 Crim.L.Bull. 323 (1969); Comment, "Evidence: Admissibility of Spectrographic Voice Identification," 56 Minn.L.Rev. 1235 (1972); Comment, "Evidence—Scientific Evidence—Voice Identification Held Inadmissible Pending the General Acceptance of the Technique by the Scientific Community," 9 U.Balt.L.Rev. 146 (1979); Comment, "Evidence—Voiceprint Method of Identification—Reluctance of the Courts Toward Acceptance of Scientific Evidence," 12 N.Y.L.F. 501 (1966); Comment, "New Trends in Admissibility of Polygraph Tests and Spectrogram Voiceprint Identification Evidence," 3 Mem.St. U.L.Rev. 282 (1973); Comment, "The Admissibility of Spectrographic Voice Identification in the State Courts," 70 J.Crim.L. & Criminology 349 (1979); Comment, "The Evidentiary Value of Spectrographic Voice Identification," 63 J.Crim.L., Criminology & Pol.Sci. 343 (1972); Comment, "The Voiceprint Dilemma: Should Voices Be Seen and Not Heard?", 35 Md.L.Rev. 267 (1975); Comment, "Voice Identification Testimony Based on Spectrographic Analysis Inadmissible Because the Technique has Not Gained General Acceptance in the Scientific Community," 39 Md.L.Rev. 629 (1980); Comment, "Voiceprint Identification," 61 Geo.L.J. 703 (1973); Comment, "Voiceprint Identification: The Trend Towards Admissibility," 9 New Eng.L. Rev. 419 (1974); Comment, "Voiceprints" in the Courtroom—Scientific and Evidentiary Problems," 21 Ariz.L.Rev. 1163 (1979); Comment, "Voiceprints—The Admissibility Question: What

Evidentiary Standard Should Apply?", 19 St. Louis U.L.J. 509 (1975); Comment, "Voiceprints: The End of the Yellow Brick Road," 8 U.S.F.L.Rev. 702 (1974); Comment, "Voice Spectrogram Analysis: A Case of False Elimination," 1980 Ariz.St.L.J. 217 (1980); Decker and Handler, "Voiceprint Identification—Out of the *Frye* Pan and into Admissibility," 26 Am.U.L.Rev. 314 (1977); Endres, Bambach, and Flosser, "Voice Spectrograms as a Function of Age, Voice Disguise, and Voice Imitation," 49 J.Acoust.Soc.Am. 1842 (1971); Gorecki, "Evidentiary Use of the Voice Spectrograph in Criminal Proceedings," 77 Mil.L.Rev. 167 (1977); Greene, "Voiceprint Identification: The Case in Favor of Admissibility," 13 Am.Crim.L.Rev. 171 (1975); Hazen, "Effects of Differing Phonetic Contexts on Spectrographic Speaker Identification," 54 J. Acoust. Soc.Am. 650 (1973); Hecker, Stevens, von Bismark, and Williams, "Manifestations of Task-Induced Stress in the Acoustic Speech Signal," 44 J.Acoust.Soc.Am. 993 (1968); Hennessy and Romig, "Sound, Speech, Phonetics, and Voiceprint Identification," 16 J. Forensic Sci. 438 (1971); Hollien, "The Peculiar Case of 'Voiceprints,'" 56 J.Acoust.Soc.Am. 210 (1974); Hollien and McGlone, "The Effect of Disguise on 'Voiceprint' Identification," 2 J.Crim.Def. 117 (1976); Jones, "Danger—Voiceprints Ahead," 11 Am.Crim.L.Rev. 549 (1973); Jones, "Evidence vel non—the *Non* sense of Voiceprint Identification," 62 Ky.L.J. 301 (1974); Kamine, "The Voiceprint Technique: Its Structure and Reliability", 6 San Diego L.Rev. 213 (1969); Kersta, "Speaker Recognition and Identification by Voiceprints," 40 Conn.B.J. 586 (1966); Kersta, "Voiceprint Identification," 196 Nature 1253 (1962); Manning, "Understanding Speaker Identification Techniques," 17 Trial 61 (Oct. 1981); Reich, Moll, and Curtis, "Effects of Selected Vocal Disguises Upon Spectrographic Speaker Identification," 60 J.Acoust.Soc.Am. 919 (1976); Shaw, "Crime Countermeasures," 9 Physics in Technology 192 (1978); Siegal, "Cross-Examination of a 'Voiceprint' Expert: A Blueprint for Trial Lawyers," 12 Crim.L.Bull. 509 (1976); Stevens, Williams, Carbonell, and Woods, "Speaker Authentication and Identification: A Comparison of Spectrographic and Auditory Presentations of Speech Material," 44 J.Acoust.Soc.Am. 1596 (1968); Thomas, "Voiceprint—Myth or Miracle (The Eyes Have It)," 3 U.San Fern.V.L. Rev. 15 (1974); Tosi, Oyer, Lashbrook, Pedrey, Nicol, and Nash, "Experiment on Voice Identification," 51 J.Acoust.Soc.Am. 2030 (1972); Williams and Stevens, "Emotions and Speech; Some Acoustical Correlates," 52 J.Acoust. Soc.Am. 1238 (1972); Young and Campbell, "Ef-

Among the many reports and studies, we found one, *On The Theory and Practice of Voice Identification, supra,* to be particularly persuasive. The National Academy of Sciences was requested by the Federal Bureau of Investigation to evaluate the use of sound spectrograms for identifying speakers. The National Research Council appointed a multi-disciplinary committee to investigate and evaluate spectrographic techniques. The committee included scientists in the fields of acoustics, physics, speech communications, audio engineering, psychophysics, audiology and speech, and communication engineering.

In the committee's report, it summarized the current "state of the art."

"At the present time, the technique of voice identification is a practical methodology that is rather widely used, but that lacks a solid theoretical basis of answers to scientific questions concerning the foundations of voice identification. This disparity between practice and theory appears to be recognized by practitioners and scientists involved in the field of voice identification.

\* \* \* \* \* \*

"This disparity between the state of development of the theory of voice identification and the state of development of the practice of voice identification is not uncommon in the evolution of a new technology. Voice identification, with its empirical advancement and its inadequacy of basic knowledge, is now at the state of an empirical art and is moving toward the stage of an engineering practice. The final stage would be that of a fully developed technology based on science.

\* \* \* \* \* \*

"The engineering practice of voice identification may evolve as objective measures for assessing performance are developed empirically and as the methods of training and practice are improved. The third stage, that of a technology with a solid scientific basis, requires the parallel evolution of the science underlying voice identification. Although beginnings in this evolution have been made and several major scientific problems have been identified, the relevant information now available does not provide an adequate basis for the Committee to predict whether, and if so, when, the aural-visual process of voice identification will become a fully developed technology based solidly on science."

*On the Theory and Practice of Voice Identification, supra,* at 10–12.

One of the primary concerns of the committee was the degree of variability among spectrographic depictions of the same word uttered by the same speaker. Sources of that variability include the speaker's age, mood, health (*e.g.,* upper respiratory infections can cause considerable change from the "normal" voice pattern), allergies, level of psychological stress, level of general fatigue, and his or her level of vocal fatigue. Whether the speaker is under the influence of medication or intoxicants also effects his or her speech patterns as does the loudness of the speech or an attempt at mimicry or disguise. Dental work, whether the loss of a tooth, the addition of bridgework, or the presence of dentures, will also alter a person's speech. The variations become increasingly significant the greater the elapsed time is between the voice samples. Other factors which can lead to sole speaker variability are whether a word is spoken singly or as part of a sentence, whether there is room or background noise, and whether the sample is recorded over a telephone. There are also, of course, inherent differences among the quality of recording equipment and the skills of spectographic examiners. All of these factors lead to differing degrees of

fects of Context on Talker Identification," 42 J.Acoust.Soc.Am. 1250 (1967).
*See also* A.B.A. Section of Criminal Justice, *Voiceprint Identification: Admissible Evidence?* (1974); Committee on Evaluation of Sound Spectrograms, National Research Council, *On the Theory and Practice of Voice Identification* (1979); A. Moenssens and F. Inbau, *Scientific Evidence in Criminal Cases* (2d ed. 1978).

accuracy and corresponding degrees of error in correct identifications.

The committee concluded that a broad range of research was necessary for the full development of voice identification by spectrographic analysis. It made specific recommendations relating to the scientific understanding and the forensic practice of voice identification.

 We have been cited to no authority, and have found none ourselves, that indicates whether any further research has been done in this area and, if it has been, what the results have been. Lacking any such information, we cannot say that spectrographic analysis of speech is generally accepted in the relevant scientific community as producing uniformly reliable results. Therefore, under the *Frye* rule, we hold that expert opinions based on comparisons of speech spectrograms are not admissible as evidence in criminal trials.[6] This holding is, of course, subject to reconsideration by this Court if the use of spectrograms does, in the future, achieve general acceptance in the scientific community.

In appellant's case, it was error for the trial court to allow expert testimony concerning spectrographic comparisons. However, we hold that the error was harmless. Appellant himself introduced the spectrographic evidence and argued that it exculpated him. His expert testified that appellant was "probably not" the "Chayo" on the tapes. Despite this testimony, the jury found appellant guilty beyond a reasonable doubt. The admission of the spectrographic evidence, though error, was not prejudicial against appellant.

The conviction is affirmed; the sentence is affirmed as modified.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.

---

6. Other courts presented with this issue have reached varying results. Some courts, generally following the *Frye* rule, refuse to allow spectrographic evidence. *See United States v. McDaniel,* 538 F.2d 408 (D.C.Cir.1976); *United States v. Addison,* 498 F.2d 741 (D.C.Cir.1974); *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976); *Brown v. United States,* 384 A.2d 647 (D.C.1978); *Cornett v. State,* 450 N.E.2d 498 (Ind.1983); *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978); *People v. Tobey,* 401 Mich. 141, 257 N.W.2d 537 (1977); *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977). Other courts, generally following modifications of *Frye* or not mentioning it at all; have allowed spectrographic evidence. *See United States v.*

*Williams,* 583 F.2d 1194 (2d Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *United States v. Baller,* 519 F.2d 463 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975); *United States v. Franks,* 511 F.2d 25 (6th Cir.), *cert. denied sub nom. Mitchell v. United States,* 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975); *Alea v. State,* 265 So.2d 96 (Fla.App.1972); *Worley v. State,* 263 So.2d 613 (Fla.App.1972); *State v. Williams,* 388 A.2d 500 (Me.1978); *Commonwealth v. Lykus,* 367 Mass. 191, 327 N.E.2d 671 (1975); *State ex rel. Trimble v. Hedman,* 291 Minn. 442, 192 N.W.2d 432 (1971); *State v. Olderman,* 44 Ohio App.2d 130, 336 N.E.2d 442 (1975). *See generally,* 97 A.L. R.3d 294 (1980).