Randall WILLIAMS, Appellant,

v.

STATE of Alaska, Appellee.

No. 1377.

Court of Appeals of Alaska.

Nov. 10, 1994.

Geoffry B. Wildridge, Asst. Public Defender, Fairbanks, and John B. Salemi, Public Defender, Anchorage, for appellant.

Jacquelyn L. Parris, Asst. Dist. Atty., Harry L. Davis, Dist. Atty., Fairbanks, and Bruce M. Botelho, Acting Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

MANNHEIMER, Judge.

Randall Williams appeals his conviction for driving while intoxicated, AS 28.35.030(a). We affirm.

On March 20, 1993, Alaska State Trooper Gary Tellep observed one car towing another down College Road in Fairbanks. Concerned that the tow chain was too short for safety, Trooper Tellep stopped the two vehicles. Williams was steering the car that was being towed. His breath had an odor of alcoholic beverages, and there were empty beer cans in the towed vehicle. Tellep asked Williams to perform some field sobriety tests; as a result of Williams's performance on these tests, Tellep arrested Williams for driving while intoxicated. A later Intoximeter test showed Williams's blood alcohol level to be .241 percent.

Williams asked the district court to suppress all of the State's evidence and to dismiss his case. He argued that Tellep's decision to arrest him had not been supported by probable cause. The underlying basis of Williams's argument was his assertion that his towed vehicle was not "operable" within the meaning of the Alaska cases construing the DWI statute. The State stipulated that, at the time it was being towed, Williams's car could not move under its own power because its engine would not start. Nevertheless, District Court Judge Mark I. Wood denied Williams's motion. Williams renews his argument on appeal.

We must first decide if Williams was "driving" or "operating" a vehicle. Several years ago, Alaska law contained a regulation that governed this situation. Former 13 AAC 10.200, cited in the supreme court's decision in *Jacobson v. State,* 551 P.2d 935, 937 (Alaska 1976), declared that "[i]n the traffic regulations and in AS 28.35.030, ... 'operator' means a person who drives [a vehicle] or is in actual physical control of a vehicle *or who is exercising control over or steering a vehicle being towed by a motor vehicle* ". However, this regulation was repealed in 1979. In its place, AS 28.40.100(a)(7) defines the term "driver". This statutory definition omits any reference to towed vehicles; it declares simply that "driver" means "a person who drives or is in actual physical control of a vehicle".

Despite the failure of AS 28.40.100(a)(7) to specifically mention towed vehicles, we conclude that a person who steers a towed vehicle is "driving" within the meaning of the Alaska statutes. Virtually unanimous case law from other jurisdictions holds that "driving" means exercising control over the motion of a moving vehicle, regardless of what impetus is propelling the vehicle. *See State v. Keeton,* 74 Ohio App.3d 817, 600 N.E.2d 752, 755–56 (1991) (steering a vehicle being towed out of a ditch is "operating"); *State v. Tacey,* 102 Vt. 439, 150 A. 68, 69–70 (1930) (steering a vehicle being towed down the road by a truck is "operating"); *State v. Larson,* 479 N.W.2d 472, 473–74 (N.D.1992) (steering a vehicle being pushed from behind by another vehicle is "driving"); *Hester v. State,* 196 Tenn. 680, 270 S.W.2d 321, 321–22 (1954) (same); *Chamberlain v. State,* 163 Tex.Crim. 529, 294 S.W.2d 719, 720 (1956) (same); *Rogers v. State,* 147 Tex.Crim. 602,

183 S.W.2d 572 (1944) (same); *Walker v. State*, 241 Ark. 396, 408 S.W.2d 474, 475–76 (1966) (same); *State v. Edmonson*, 371 S.W.2d 273, 274–75 (Mo.1963) (same); *Duckett v. State*, 108 Ga.App. 317, 132 S.E.2d 811 (1963) (guiding a car being pushed by 10 or 12 people is "operating"); *Farley v. State*, 251 Miss. 497, 170 So.2d 625, 626–27 (1965) (steering a car that is coasting downhill is "operating"); *State v. Jeanette*, 172 N.J.Super. 587, 412 A.2d 1339, 1340–42 (App.1980) (pushing a motorcycle using one's feet, and coasting and riding on downhill inclines, is "operating"); *State v. Cole*, 62 Ohio Misc.2d 70, 591 N.E.2d 1378 (Muni.1992) (same); *People v. Jordan*, 75 Cal.App.3d Supp. 1, 142 Cal.Rptr. 401, 405–07 (1977) (pedaling a moped with the motor turned off is "driving"). *See* James O. Pearson, Jr., Annotation: "What Constitutes Driving, Operating, or Being in Control of a Motor Vehicle for Purposes of [a] Driving While Intoxicated Statute or Ordinance", 93 A.L.R.3d 7 (1979), §§ 6 and 10. *See also* 7A Am.Jur.2d "Automobiles and Highway Traffic", § 300, pp. 481–82 & 483, stating that both the terms "driving" and "operating" are normally held to include the act of steering a vehicle that is being pushed or towed.

In many of the cases cited in the preceding paragraph, the defendant's vehicle was being towed or pushed because it was not capable of moving under its own power. *Tacey*, 150 A. at 69 (the defendant's car could not be started); *Larson*, 479 N.W.2d at 472 (the defendant's bus had broken down); *Chamberlain*, 294 S.W.2d at 720 (the engine of the defendant's car had stopped running); *Duckett*, 132 S.E.2d at 812 (the defendant's car would not start); *Farley*, 170 So.2d at 626 (the defendant "tried to crank the car but it would not start"; police officers also could not start the car, and they eventually had to call a tow truck). Nevertheless, the courts ruled that the defendants' conduct fell squarely within the policy of their states' drunk driving statutes.

> [T]he legislature has criminalized the conduct of those who [, while intoxicated,] pilot their moving vehicles on the highway, thereby endangering themselves and all those who encounter them in their inebriated journey.

*Larson*, 479 N.W.2d at 474. *Accord, Hester*, 270 S.W.2d at 322. See also *Jeanette*, 412 A.2d at 1341, upholding the conviction of a motorcyclist who was forced to coast his bike after his girlfriend withheld the ignition key because she thought he should not drive. The New Jersey court stated:

> This court is of the opinion that the public is to be protected from the operation by an intoxicated driver of a motor vehicle, whether it is powered by its engine or gravity. It is the driver's judgment and dexterity that are impaired, and this impairment is present irrespective of the source of the vehicle's power.

We find ourselves in agreement with these courts. The public danger addressed by Alaska's DWI statute is the danger posed by intoxicated people who undertake to control the movement of an automobile on a highway at a time when they are not fully capable of exercising the judgement and coordination required to drive safely. An intoxicated person in control of a car moving down a highway—whether that car is being towed or pushed, or whether it is coasting downhill—poses an equivalent danger to passengers, to other drivers, and to pedestrians, whether or not the car's engine will start. We hold that the act of steering a towed car is "driving" within the meaning of AS 28.35.030(a) and AS 28.40.100(a)(7). Compare *Jacobson v. State*, 551 P.2d 935, 938 (Alaska 1976), where our supreme court held that an intoxicated person in control of a non-moving vehicle was a sufficient danger to public safety to fall within the DWI statute.

■ Williams next argues that, because his car could not be started, it was no longer a "motor vehicle" within the meaning of AS 28.40.100(a)(12). That statute declares that the term "motor vehicle" means "a vehicle which is self-propelled except a vehicle moved by human or animal power". We, however, reject the idea that a motor vehicle ceases to be a motor vehicle whenever it cannot be started. If we were to read the statute literally (as Williams suggests we should), we would have to conclude that an automobile is only a "motor vehicle" when the engine is actually running—that when

someone turns the engine off, or when the automobile stalls, the automobile stops being a "motor vehicle" because it is no longer "self-propelled". Such a conclusion is illogical and at odds with the legislative intent behind the statutory definition. We conclude instead that a vehicle's status as a "motor vehicle" depends on whether the vehicle was designed or constructed to be self-propelled, not whether it is presently capable of moving under its own power. As the Vermont Supreme Court said:

> Manifestly it was the design, mechanism, and construction of the vehicle, and not its temporary condition, that the Legislature had in mind when framing the definition of a motor vehicle.

*Tacey*, 150 A. at 69. *Accord, Farley*, 170 So.2d at 627. We recognize that the Oregon Supreme Court reached the opposite result in *State v. Duggan*, 290 Or. 369, 622 P.2d 316 (1981), but we believe that the dissent in that case is better-reasoned.[1]

Finally, Williams argues that our construction of "driving" and "motor vehicle" are at odds with the Alaska Supreme Court's decision in *Department of Public Safety v. Conley*, 754 P.2d 232 (Alaska 1988). *Conley* involved an administrative license revocation action based on Conley's violation of the DWI statute. Conley had been involved in a disturbance at a bar, and she had been asked to leave. The police officer who responded to the disturbance concluded that Conley was too intoxicated to drive. He tried to persuade her to take a cab or to ask a friend for a ride home, but she refused. A little later, the officer saw Conley approach her car and, with keys in hand, sit down behind the wheel. The officer stepped toward the car and positioned himself so that Conley could not close the door. He asked her what she was doing, and Conley replied that she was about to drive home. As Conley was moving her hand to insert the key in the ignition, the officer arrested her. *Conley*, 754 P.2d at 233.

Because Conley had not moved the car or operated any of its controls or mechanisms, the question litigated at the administrative hearing was whether Conley had been in physical control of the vehicle at the time of her arrest. See *Jacobson*, 551 P.2d at 938, holding that AS 28.35.030(a) prohibits an intoxicated person from being in "actual physical control" of a motor vehicle. As part of her defense, Conley argued that the State had failed to show that her car was "operable" at the time she exercised control over it. The supreme court said:

> We agree that a finding that the car is "reasonably capable of being rendered operable" is required in civil driver's license revocation proceedings. *See State v. Smelter*, ... [36 Wash.App. 439] 674 P.2d 690, 693 (1984).

*Conley*, 754 P.2d at 236.

While *Conley* speaks only of "civil driver's license revocation proceedings", the Washington case cited by the supreme court was a criminal prosecution for DWI. We assume, for purposes of deciding this appeal, that the "operability" requirement announced in *Conley* applies to DWI prosecutions as well as to administrative proceedings.

Nevertheless, we conclude that Williams's case presents no question of "operability". Both *Conley* and the Washington case it relies on, *Smelter*, imposed the operability requirement in the context of a defendant who was charged, not for driving or operating a motor vehicle, but for simply being in control of one. The Washington Court of Appeals explained that the requirement of operability was being added to make sure that the defendant's conduct truly posed the danger envisioned by the legislature when it defined the crime of driving while intoxicated to include simply being in control of a non-moving vehicle:

> A definition of "control" that focuses [solely] upon "the authority to manage" a motor vehicle, perhaps as evidenced by lawful possession of the keys while seated in the driver's seat, would permit a finding

---

1. We also note that if a vehicle ceased being a "motor vehicle" whenever it could not run under its own power, the "operability" requirement imposed by *Department of Public Safety v. Con-* *ley*, 754 P.2d 232 (Alaska 1988)—which we are about to discuss—would be completely superfluous.

of actual physical control of an inoperable vehicle. The question of what constitutes the elements of ["]actual physical control["], such as whether the motor must be running or, by extension, whether the vehicle must be operable, has been characterized as a policy issue. *State v. Juncewski*, 308 N.W.2d 316, 320 (Minn.1981).

*Smelter*, 674 P.2d at 693. The Washington court then continued:

In general, laws prohibiting driving while intoxicated are deemed remedial statutes, to be "liberally interpreted in favor of the public interest and against the private interests of the drivers involved." [*Juncewski*, 308 N.W.2d] at 319. Specifically, actual physical control statutes have been characterized as "preventive measure[s]," *State v. Schuler*, [243 N.W.2d 367, 370 (N.D. 1976)], which "deter individuals who have been drinking intoxicating liquor from getting into their vehicles, except as passengers,", *State v. Ghylin*, [250 N.W.2d 252, 255 (N.D.1977)], and which "enable the drunken driver to be apprehended before he strikes." *State v. Webb*, [78 Ariz. 8, 274 P.2d 338, 339 (1954)].

*Smelter*, 674 P.2d at 693.

When the Washington court spoke of apprehending an intoxicated driver "before he strikes", we believe the court meant "before he assumes control of a moving vehicle". If, as the Washington court intimated, the legislative aim behind criminalizing "actual physical control" was to forestall intoxicated persons from assuming control of a moving vehicle, then it makes sense to include an "operability" requirement of some sort when defining what instances of physical control actually create the danger contemplated by the legislature.

However, the evidence in this case shows that Williams was not merely in physical control of his vehicle. He was driving it— steering it as it moved along the road. Williams's conduct clearly created the danger envisioned by the legislature when it prohibited driving while intoxicated. By failing to brake or by steering incorrectly, Williams might have struck the car towing him. By swerving from his lane, he might have collided with on-coming traffic. Or, by braking or maneuvering his vehicle in such a way as to disrupt the motion of the towing vehicle, he might have caused the towing vehicle to strike another vehicle or a pedestrian. See our decision in *Smith v. State*, 739 P.2d 1306, 1307 (Alaska App.1987), in which the driver of a towed vehicle was convicted of criminally negligent homicide under AS 11.41.130(a): during the towing, Smith first struck the vehicle that was towing him, then later swerved his towed vehicle over the center line, struck an on-coming car, and killed the driver.

For these reasons, we hold that a person who steers a towed automobile is driving a "motor vehicle" within the meaning of Alaska's driving while intoxicated statute, AS 28.35.030(a). We consequently uphold Judge Wood's denial of Williams's motion to dismiss the case. For the same reasons, we uphold District Court Judge Jane F. Kauvar's refusal (as the trial judge) to instruct the jury that Williams could not be convicted unless the jury found that his vehicle was "reasonably capable of being rendered operable". Because Williams's vehicle was actually moving along the road, its operability was irrelevant.

Williams next challenges the propriety of a response Judge Kauvar gave to a question posed by the jury. The jury in Williams's case was instructed that the crime of driving while intoxicated could be established either by proof that the defendant had been "driving" or by proof that the defendant had "actual physical control over the vehicle". However, the same jury instruction informed the jury that "the act of driving involves actual movement of a motor vehicle *caused by the acts of the driver*". This limitation was incorrect. Williams's act of steering his towed vehicle was "driving" for purposes of the DWI statute even though the towing vehicle provided the motive power. However, apparently as a result of this definition of "driving", the jury focused on a theory of "actual physical control".

The instruction on "actual physical control" stated, in pertinent part:

To exercise "actual physical control" means a person must be physically or bodily able to assert dominion, in the sense of

movement, over an object as he would if he were actually driving the vehicle.

During its deliberations, the jury sent a note to the court asking for a definition of "dominion". Pursuant to a stipulation of the parties, Judge Kauvar answered the jury's question by telling them that "dominion" meant "supreme authority or control".

However, the jury later sent another note asking for a more complete definition of "dominion", and also asking whether the adjective "supreme" was intended to modify both "authority" and "control", or simply "authority".[2] Williams asked Judge Kauvar to tell the jury that "dominion" required "supreme control", but Judge Kauvar instead told the jury that "dominion" included not only "perfect control" but also "preponderant or overriding influence".

On appeal, Williams cites *Black's Law Dictionary* (6th ed. 1991), p. 486, for the proposition that "dominion" requires a finding of "perfect control" or "complete retention of control". However, the *Black's* entry clearly refers to dominion over property; the complete phrases it uses are "perfect control in right of ownership" and "complete retention of control over disposition". This definition is not controlling here.

It is obvious that the driver of a towed vehicle does not have "perfect control" over the movements of the vehicle. Nevertheless, such a driver has sufficient control over the vehicle to pose a significant danger to others, whether or not the driver is intoxicated. *See Smith v. State, supra.* Judge Kauvar did not commit error when she refused to define "actual physical control" as requiring "perfect control".

Williams's next point on appeal concerns an evidentiary ruling of the trial judge. Among the field sobriety tests Trooper Tellep administered to Williams was the horizontal gaze nystagmus (HGN) test. This test, in which a suspect is asked to track a

moving object with his or her eyes, is described in *State v. Grier,* 791 P.2d 627 (Alaska App.1990). Williams asked Judge Kauvar to prohibit the State from introducing evidence of this test; he argued that the State had not yet proved that the HGN test was generally accepted within the scientific community as a valid way to test a person's level of intoxication. *See Contreras v. State,* 718 P.2d 129, 134–36 (Alaska 1986); *Pulakis v. State,* 476 P.2d 474, 478 (Alaska 1970); *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). *But see Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Judge Kauvar denied Williams's request, relying on this court's decision in *Grier.*

*Grier* is not dispositive of this issue. In *Grier,* this court held that the HGN test was reliable enough to be used by police officers in making decisions to arrest. *Grier,* 791 P.2d at 631. But at the same time this court expressly noted that, to reach this holding, it was unnecessary to decide whether the HGN test met the requirements of *Contreras* and *Frye. Grier,* 791 P.2d at 631 n. 2. The question of whether HGN evidence is admissible at criminal trials in this state is still open.

■ After examination of the record in this case, we find that it is still unnecessary to decide the admissibility of HGN evidence. While Judge Kauvar did deny Williams's request for a protective order, no evidence of Williams's performance on the HGN test was introduced at his trial. Trooper Tellep testified that he administered the HGN test to Williams, and he described the testing procedure to the jury. Tellep testified that "in a good portion of the ... population, [a "bouncing of the eye" during the HGN test] shows a level of intoxication". However, Tellep never described Williams's performance on the HGN test, nor did he state whether Williams had passed or failed the test.[3] The jury

---

2. The jury's note read:

   (1) We require further definitions of dominion[.]
   (2) Did your definition "supreme authority or control" mean "control or supreme authority" or did it mean "supreme authority or supreme control"?

   (3) What is "supreme"? More than 50%; less than 99%?

3. After Tellep had explained the HGN test to the jury, the prosecutor asked Tellep to go back and detail Williams's performance when reciting the alphabet and counting backwards. After Tellep described Williams's performance on these tests,

heard an audio tape of the field sobriety tests, but that tape contains no statement indicating how Williams did on the HGN test. On the tape, Tellep can be heard instructing Williams on how to take the test, but nothing is said about Williams's performance; after a brief silence, Tellep can be heard asking Williams to perform balance tests. In sum, the jury heard that Williams had been asked to take the HGN test, but they heard no evidence that Williams had failed the HGN test.

■ The prosecutor's opening statement contained an assertion that Williams had failed the HGN test. And, despite the lack of evidence to support it, the prosecutor's final argument contained a similar assertion. However, these were the only comments at Williams's trial about his performance on the HGN test, and both comments were made in the middle of long lists of factors indicating that Williams was intoxicated.

Williams's attorney did not object to the prosecutor's statement during final argument. Moreover, Judge Kauvar specifically instructed the jury that they "must not consider as evidence any statement or argument of counsel". We therefore find that the prosecutor's assertion that Williams had failed the HGN test was harmless error.

Williams's final contention on appeal is that Judge Kauvar should not have allowed the prosecutor to introduce evidence of Williams's .241 intoximeter reading. The underlying facts are as follows:

Following Williams's arrest, Tellep took Williams to the trooper office and there administered the Intoximeter 3000 breath test. Tellep waited the 15-minute observation period mandated by 13 AAC 63.040(a)(1) before asking Williams to blow into the machine. However, when Williams did so, the Intoximeter aborted the test, giving a reading of "mouth alcohol". Tellep explained that this meant the machine was getting breath from

Williams's mouth but was not getting a proper breath sample from his lungs.

About nine minutes later, Williams again blew into the Intoximeter. This time, the machine completed the test and produced the breath-alcohol result of .241 (nearly two and a half times the legal limit).[4]

At trial, Williams objected to the admission of the breath test result. He argued that the mandatory 15-minute observation period applied again after an aborted test attempt, and that therefore his Intoximeter result was invalid because Tellep had not waited the full 15 minutes between the aborted "mouth alcohol" test and the second test that produced the .241 result. Williams called the court's attention to a portion of the State Troopers' Intoximeter instruction manual which specifically instructed Intoximeter operators that an additional 15-minute observation period was necessary after any "mouth alcohol" reading before they again attempted to run the test.

Judge Kauvar concluded that the Troopers' instruction manual did not have the force of law and that 13 AAC 63.040 controlled the administration of the test. Judge Kauvar further found that, under this regulation, the only mandatory waiting period was the initial 15-minute observation period—that the regulation did not require an additional observation period after an aborted test. Judge Kauvar therefore ruled that Williams's Intoximeter breath test result could be admitted, although she expressly allowed Williams both to argue and to introduce evidence indicating that the breath test result was inaccurate.

Williams did cross-examine Tellep about the instruction manual provision directing Intoximeter operators to wait an additional 15 minutes after a "mouth alcohol" reading. Tellep stated that he was unfamiliar with this provision and that it had apparently been added to the manual after he received his training at the State Trooper Academy.

---

the prosecutor asked Tellep to move on to the next tests (the balancing tests), apparently forgetting that the subject of the HGN test had been dropped before Tellep ever discussed Williams's performance on that test.

4. After submitting to the breath test, Williams opted to have an independent test done of his blood-alcohol level. A blood sample was drawn and was sent to a hospital for testing, but Tellep did not know what the result of this test was, and neither party introduced other evidence concerning this independent test.

The prosecutor then called Alaska State Trooper Richard Quinn to testify as an expert witness on the Intoximeter 3000. Quinn testified that the Intoximeter gives a "mouth alcohol" reading and aborts the breath test whenever it detects that the alcohol content of the incoming breath sample decreases sharply during the intake of the sample. Quinn testified that this decrease in alcohol content can indicate either that residual alcohol is present in the test subject's mouth or that the test subject has not blown steadily and evenly into the machine.

Quinn also testified that, despite the Intoximeter's programmed response of "mouth alcohol", his personal experience was that a suspect's failure to blow steadily and evenly was generally the cause of a "mouth alcohol" reading whenever the subject (like Williams) was eventually determined to have a breath-alcohol level of .20 or higher.

In addition, Quinn testified that no additional 15–minute waiting period was required after a "mouth alcohol" reading. Quinn acknowledged the contrary statement in the instruction manual, but he nevertheless declared that this statement was inconsistent with State Trooper policy and was unsupported by any considerations of test accuracy. Quinn explained that the 15–minute waiting period suggested in the training manual is a conservative one: according to information Quinn received in training, residual alcohol in a person's mouth generally disappears within eight to ten minutes. Quinn added that even this 8– to 10–minute figure is conservative because, from his own experimentation with the Intoximeter, mouth alcohol becomes undetectable by the machine after five minutes.

Finally, Quinn testified that if a suspect's residual mouth alcohol has not disappeared by the time of the next test attempt, the Intoximeter will again detect the mouth alcohol and will again abort the test.

On appeal, Williams argues that Judge Kauvar's construction of 13 AAC 63.040(a)(1) makes no sense. He argues that if the Intoximeter can not be trusted to give an accu-

rate reading without an initial 15–minute observation period before a suspect's first breath test, then the machine can not be trusted to give an accurate reading unless another full 15–minute waiting period is observed prior to any follow-up test. However, the only evidence presented on this question was Richard Quinn's testimony that a second 15–minute waiting period was not necessary under the circumstances of this case and that, given the 9–minute interval between Williams's first and second tests, there was little or no reason to doubt the validity of the result yielded by the second test.

■ On this record, Judge Kauvar did not err in finding that 13 AAC 63.040(a)(1) only envisioned an initial 15–minute waiting period. Moreover, even if a second 15–minute waiting period were required, Quinn's testimony established that Williams's breath test was conducted in substantial compliance with the regulatory requirement.

■ Absolute compliance with the breath test regulations is not required to secure admission of the breath test result; substantial compliance will suffice for admissibility, after which the defendant may present evidence questioning the validity of the test and may argue to the jury that the breath test result deserves little weight. *Oveson v. Anchorage*, 574 P.2d 801, 804–05 (Alaska 1978); *Gilbreath v. Anchorage*, 773 P.2d 218, 221–22 (Alaska App.1989); *Ahsogaek v. State*, 652 P.2d 505, 506 (Alaska App.1982).

Here, Williams was able to cross-examine both Tellep, the trooper who administered the test, and Quinn, the trooper who testified as an expert witness on Intoximeter testing. Williams cross-examined both of these witnesses about the provision in the Troopers' training manual that prescribed a second 15–minute waiting period, and he questioned Quinn about the reliability of an Intoximeter result taken less than 15 minutes after a "mouth alcohol" reading. Moreover, Judge Kauvar instructed the jury to weigh the breath test result in light of the government's level of compliance with the waiting-period regulation.[5] On this record, we con-

5. Judge Kauvar told the jurors:

To be considered valid, the chemical analysis of the person's breath shall have been per-

clude that Judge Kauvar did not abuse her discretion when she allowed the government to introduce the Intoximeter result.

The judgement of the district court is AFFIRMED.

formed according to methods approved by the Department of Public Safety. If it is established that the chemical analysis of breath was performed according to approved methods by a person trained according to techniques, methods and standards of training approved by the Department of Public Safety, it may be inferred that the test results are valid, but if it is not so established you may reject the test entirely or give it such weight as you think it deserves.

The weight to be given the Intoximeter evidence is strictly a factual matter for you, the Jury.

Regulations adopted by the Department of Public Safety require that the following procedure must be used to obtain and analyze a breath sample on a breath test instrument:

"Observe the person to be tested for at least 15 minutes immediately before testing, to insure that the person does not regurgitate or place anything in his mouth during that period."