**STATE of Alaska, Petitioner,**

v.

**George L. COON, Respondent.**

**No. S–6893.**

Supreme Court of Alaska.

March 5, 1999.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Petitioner.

George Coon, pro se, Anchorage.

Mauri Long, Dillon & Findley, P.C., Anchorage, for Amicus Curiae Alaska Academy of Trial Lawyers.

G. Blair McCune, Deputy Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Amicus Curiae Alaska Public Defender Agency.

Gary A. Zipkin and Nelleene A. Boothby, Guess & Rudd, Anchorage, for Amicus Curiae Defense Counsel of Alaska, Inc.

Jonathan Hoffman, Martin, Bischoff, Templeton, Langslet & Hoffman, Anchorage, Hugh F. Young, Jr., Product Liability Advisory Council, Inc., Reston, Virginia, and Mary A. Wells, Suanne M. Dell, Gregory E. Sopkin, Wells, Anderson & Race L.L.C., Denver, Colorado, for Amicus Curiae Product Liability Advisory Council.

Rex Lamont Butler and Linda S. Thomas, Rex Lamont Butler and Associates, Anchorage, for Amicus Curiae Rex Lamont Butler and Associates.

Before MATTHEWS, Chief Justice, and COMPTON, EASTAUGH, and FABE, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

A jury found George Coon guilty of making three terroristic telephone calls. We must decide whether the superior court erred in admitting opinion evidence, based on a voice spectrographic analysis, that Coon made those calls. Applying the Alaska Rules of Evidence and the standard for admitting novel scientific opinion evidence, articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), we hold that it was not error to admit that evidence, and affirm Coon's conviction.

### II. FACTS AND PROCEEDINGS

Three messages threatening David Rudolph's life were left on Deborah Rudolph's telephone answering machine. Deborah, Coon's former daughter-in-law, recognized the recorded voice as Coon's. The State charged Coon under former AS 11.56.810(a)(2) with terroristic threatening.

The State retained a voice analysis expert, Steve Cain, who compared the voice on the answering machine with verbatim voice exemplars provided by Coon. At Coon's 1992 trial, the superior court held a hearing outside the jury's presence to determine whether Cain's testimony would be admissible under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The superior court found that Cain's testimony was relevant and would assist the jury. It therefore held that the evidence was admissible under Alaska Evidence Rule 702. The court also concluded that spectrographic analysis of voices satisfied the *Frye* test for admitting novel scientific evidence, and that the identification of voices by analyzing spectrograms had been generally accepted by courts and was a reliable technique. The jury then heard Cain express his opinions that Coon made the first telephone call, and that there was a high probability Coon also made the second and third calls. Cain described for the jury the scientific foundation for his opinions. The jury found Coon guilty of terroristic threatening.

On appeal, the Alaska Court of Appeals held that the appellate record did not support admitting Cain's testimony at trial.[1] It reasoned that the State had not presented evidence concerning the relevant scientific community and whether that community generally accepted voice spectrographic analysis. It noted that the superior court had made no findings on those topics, contrary to the requirements of *Frye*. It remanded, reasoning that the State might be able to establish that voice spectrographic analysis met the *Frye*

1. *See Coon v. State*, Mem. Op. & J. No. 3070 (Alaska App., January 25, 1995).

standard for admissibility. Citing *Contreras v. State*, 718 P.2d 129 (Alaska 1986), where we adhered to the *Frye* standard, the court of appeals declined to address the State's argument that the *Frye* standard was no longer viable in Alaska following adoption of the Alaska Rules of Evidence and announcement of the *Daubert* opinion.

Petitioning for hearing, the State asked us to consider the same arguments. It also argued that the trial court's ruling satisfied *Daubert*. We granted the State's petition. Following briefing and oral argument, we remanded with directions that the superior court enter findings of fact and conclusions of law about whether Cain's testimony was admissible under Evidence Rule 703. The order also required findings of fact and conclusions of law about the admissibility of the proffered testimony under the *Frye* and *Daubert* standards. We retained jurisdiction. Entering separate findings and conclusions for each standard, the superior court ruled on remand that the evidence was admissible under both tests.

We then asked the parties and possible amici curiae to file briefs discussing whether to retain *Frye* or to adopt the test articulated in *Daubert* to determine the admissibility of scientific evidence. Five amici curiae—the Alaska Academy of Trial Lawyers (AATL), the Alaska Public Defender Agency (APDA), the Defense Counsel of Alaska (DCA), the Product Liability Advisory Counsel (PLAC), and Rex Lamont Butler and Associates (Butler)—submitted briefs thoroughly discussing the issues presented. We thank them for their valuable assistance.

III. *DISCUSSION*

A. *Frye, Daubert, and the Rules of Evidence*

■ The State asks us to abandon the scientific evidence test discussed in *Frye* and adopt the "more flexible" standard announced in *Daubert*. Whether to adopt a new standard for admitting evidence involves the interpretation of the Alaska Rules of Evidence and is therefore a legal question to which this court applies its independent judgment, adopting the rule most persuasive "in light of reason, precedent and policy." [2]

Before *Daubert* was issued, *Frye* was the dominant standard for the admissibility of scientific evidence in federal and many state courts.[3] We adopted the *Frye* standard in *Pulakis v. State*, 476 P.2d 474, 478–79 (Alaska 1970).

The *Frye* court held the results of a crude lie detector test, based on the examinee's blood pressure, to be inadmissible to show a criminal defendant's innocence.[4] The court's entire analysis consisted of one paragraph and cited no supporting authority:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained *general acceptance in the particular field* in which it belongs.[5]

The court concluded that the systolic blood pressure deception test had "not yet gained such standing and scientific recognition among physiological and psychological authorities" as to be admissible into evidence.[6]

Seventy years later in *Daubert*, the United States Supreme Court ruled that the Federal

2. *M.R.S. v. State*, 897 P.2d 63, 66 (Alaska 1995); see also *Hernandez–Robaina v. State*, 849 P.2d 783, 785 n. 2 (Alaska 1993); *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

3. *See* Jay P. Kesan, *An Autopsy of Scientific Evidence in a Post–Daubert World*, 84 Geo. L.J.1985, 1990 (1996) [hereinafter Kesan, *Autopsy* ]; Joseph R. Meaney, *From Frye to Daubert: Is a Pattern Unfolding?*, 35 Jurimetrics J. 191, 191,

194–99 (Winter 1995) [hereinafter Meaney, *Pattern Unfolding?* ].

4. *See Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923).

5. *Id.* (emphasis added).

6. *Id.*

Rules of Evidence, adopted in 1975, had superseded the *Frye* "general acceptance" test for admitting scientific evidence.[7] The plaintiffs in *Daubert* were minor children with serious birth defects.[8] They alleged that the birth defects resulted from their mothers' ingestion of Bendectin, a prescription anti-nausea drug, during pregnancy. They sought to introduce expert testimony that Bendectin was a teratogen, a substance capable of causing malformations in fetuses.[9] The trial court refused to admit the testimony and entered a defense judgment.[10] The Ninth Circuit affirmed, but the Supreme Court vacated the judgment and remanded.[11] So ruling, the Court stated that "a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal [Evidence] Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.' "[12] The Court concluded that the "austere" *Frye* "general acceptance" standard, "absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials."[13]

The Court delineated a standard that requires the trial judge to "determine at the outset, pursuant to [Federal Rule of Evidence] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[14] This two-step inquiry requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[15] The Court also provided a non-exhaustive list of factors courts may use in making this inquiry. These included (1) whether the proffered scientific theory or technique can be (and has been) empirically tested (i.e., whether the scientific method is falsifiable and refutable); (2) whether the theory or technique has been subject to peer review and publication (although publication "is not a *sine qua non* of admissibility"); (3) whether the known or potential error rate of the theory or technique is acceptable, and whether the existence and maintenance of standards controls the technique's operation; and, echoing *Frye*, (4) whether the theory or technique has attained general acceptance.[16]

The Court offered "general observations" concerning publication, peer review, and other factors, and how they pertain to scientific validity.

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.[17]

*Daubert* thus requires trial courts to ensure that scientific evidence is both relevant and reliable. The opinion is widely regarded as imposing a more rigorous "gatekeeper" function on trial courts than *Frye* did.[18]

In 1986, before the Supreme Court announced *Daubert*, but after we adopted rules of evidence in 1979 modeled after the Federal Rules of Evidence, we rejected an argument by the State in *Contreras* that the Federal Rules of Evidence had replaced

7. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

8. *See id.* at 582, 113 S.Ct. 2786.

9. *See id.* at 582–83, 113 S.Ct. 2786.

10. *See id.* at 583–84, 113 S.Ct. 2786.

11. *See id.* at 584, 598, 113 S.Ct. 2786.

12. *Daubert*, 509 U.S. at 588, 113 S.Ct. 2786 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)).

13. *Id.* at 589, 113 S.Ct. 2786.

14. *Id.* at 592, 113 S.Ct. 2786 (footnotes omitted).

15. *Id.* at 592–93, 113 S.Ct. 2786.

16. *Id.* at 593–94, 113 S.Ct. 2786.

17. *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786.

18. *See generally* John M. Conley & David W. Peterson, Essay, *The Science of Gatekeeping: The Federal Judicial Center's New Reference Manual on Scientific Evidence*, 74 N.C. L.Rev. 1183, 1186 (1996) [hereinafter Conley & Peterson, *Science of Gatekeeping* ].

*Frye*.[19] Recognizing that the federal rules did not mention the *Frye* test, we said that "[w]e believe it unlikely that this silence was meant to overturn long-established rules of admissibility based on *Frye* . . . ."[20] Although we did not expressly say so, we implicitly held that the *Frye* standard was not inconsistent with the Alaska Rules of Evidence. We also noted that "we have held other pre-existing rules to survive adoption of the rules of evidence."[21] Noting that we had adopted *Frye* in *Pulakis*, we declined to question *Frye*.[22]

We have not revisited the question since deciding *Contreras*. We noted the existence of *Daubert* in *Mattox v. State, Department of Revenue*, 875 P.2d 763, 764 n. 2 (Alaska 1994), but declined to consider the issue. The Alaska Court of Appeals has commented on the conflict between *Frye* and *Daubert*, but in conformity with *Contreras*, it has continued to apply the *Frye* standard.[23] In its Memorandum Opinion and Judgment in this case, the court of appeals stated that, given our adherence in *Contreras* to the *Frye* standard, "we believe that . . . the proper course of action is for us to follow the existing standard."[24]

We now reconsider the standard in light of *Daubert*'s holding that *Frye* is inconsistent with the Federal Rules of Evidence. Because the trial court found Cain's opinion evidence to be admissible under both tests, and assuming that it applied each test cor-rectly, it can be argued that there is no reason for us to resolve a legal issue that is not dispositive of the outcome of this petition. We nonetheless choose to reach the *Frye /Daubert* issue because the parties and the amici have thoroughly and skillfully discussed the reasons why we should or should not adopt *Daubert* in place of *Frye*. Postponing a decision for another day would be unlikely to give us the benefit of better advocacy. Further, to the extent that this issue relates to our rules of evidence, it implicates our rule-making responsibility.

Although we are not bound by the Supreme Court's conclusion, its analysis of the corresponding federal rules is helpful and, moreover, has triggered a wealth of useful critical comment.[25]

### B. *Ex Post Facto Prohibition*

Before deciding whether *Frye* remains ascendant, we consider, and reject, Coon's argument that the federal and state constitutional prohibitions on ex post facto legislation apply to judicial decisions thus barring the application of the 1993 *Daubert* decision to his 1992 trial.[26] We reach this conclusion because there is no support for Coon's proposition in federal or state law.

On its face, the federal ex post facto prohibition applies only to legislative acts, not judicial decisions.[27] We construe

**19.** *See Contreras v. State*, 718 P.2d 129, 136 (Alaska 1986).

**20.** *Id.*

**21.** *Id.*

**22.** *See id.* at 134, 136.

**23.** *See, e.g., Harmon v. State*, 908 P.2d 434, 439 & n. 5 (Alaska App.1995); *Williams v. State*, 884 P.2d 167, 172 (Alaska App.1994); *McGlauflin v. State*, 857 P.2d 366, 371 & n. 3 (Alaska App. 1993).

**24.** *Coon v. State*, Mem. Op. & J. No. 3070 at 7 (Alaska App., January 25, 1995).

**25.** *See, e.g.*, Conley & Peterson, *Science of Gatekeeping, supra* note 18; Paul C. Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, A Half–Century Later*, 80 Colum. L.Rev. 1197, 1207 (1980) [hereinafter Giannelli, *Novel Scientific Evidence* ]; Kesan, *Autopsy, su-pra* note 3; Meaney, *Pattern Unfolding?, supra* note 3; Adina Schwartz, *A "Dogma of Empiricism" Revisited: Daubert v. Merrell Dow Pharmaceuticals, Inc. and the Need to Resurrect the Philosophical Insight of Frye v. United States*, 10 Harv. J.L. & Tech. 149, 156 (Winter 1997) [hereinafter Schwartz, *Dogma of Empiricism* ]; Note, *Improving Judicial Gatekeeping: Technical Advisors and Scientific Evidence*, 110 Harv. L.Rev. 941, 953 (Feb.1997) [hereinafter *Improving Judicial Gatekeeping* ].

**26.** *See* U.S. Const. art. I, §§ 9 and 10; Alaska Const. art. I, § 15.

**27.** *See Frank v. Mangum*, 237 U.S. 309, 344, 35 S.Ct. 582, 59 L.Ed. 969 (1915); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798); and Laurence H. Tribe, *American Constitutional Law* § 10–2, at 632 (2d ed.1988).

our state prohibition no differently than the federal prohibition.[28]  Unforeseeable judicial enlargements of criminal statutes have been struck down as violative of due process when applied retroactively.[29]  But that is not the case here.

■  Even if we were to apply the prohibition on ex post facto laws to judicial decisions, changes to rules governing the admissibility of evidence do not violate it.  In *Thompson v. Missouri*, 171 U.S. 380, 387, 18 S.Ct. 922, 43 L.Ed. 204 (1898), the United States Supreme Court stated that

> [W]e cannot perceive any ground upon which to hold a statute to be ex post facto which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed.[30]

The prohibition on ex post facto laws has been construed as applicable only to penal legislation.[31]

Coon also asserts that retrospective application of *Daubert* to his case would deny him substantive and procedural due process of law and violate his right to equal protection. His cursory discussion of these issues is inadequate to preserve them.  We consider them waived.[32]

## C.  *The Alaska Rules of Evidence*

■  The State argues that we should abandon the *Frye* standard.  It asserts that *Frye* has become outdated and inadequate for modern litigation, where many cases involve sophisticated scientific data and knowledge.  It argues that *Frye* uses social, rather than scientific, criteria for determining reliability and validity when reviewing a novel scientific technique.  This causes trial courts simply to "count hands" to determine whether scientists in the relevant scientific community accept the technique as reliable, and "abdicates" judicial responsibility for determining admissibility to scientists uneducated in the law.

The State also argues that a few dissenters within a scientific community may prevent a finding of general acceptance, leading to over-representation of the dissenters' views. In addition, the State contends that *Frye*'s conservative nature causes a "gross time lag" between the development of a new scientific technique and its judicial admissibility.  This can cause certain cutting edge science to become obsolete before it is admissible under *Frye*.

Our new evidence rules became effective in 1979, nine years after we decided *Pulakis*.[33] We there approvingly quoted the *Frye* standard in holding that polygraph test results had been properly excluded.[34]

■  Several of our evidence rules bear on the admissibility of scientific evidence.  Evi-

**28.**  *See State v. Creekpaum*, 753 P.2d 1139, 1143 (Alaska 1988).

**29.**  *See, e.g., Marks v. United States*, 430 U.S. 188, 191–97, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *Bouie v. Columbia*, 378 U.S. 347, 353–54, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); and Tribe, *supra* note 27.

**30.**  *See also Hopt v. Utah*, 110 U.S. 574, 588–90, 4 S.Ct. 202, 28 L.Ed. 262 (1884) (upholding retroactive application of statute making felons competent to testify); *Allen v. State*, 945 P.2d 1233, 1236 (Alaska App.1997) (holding that because it does not alter the definition of crimes or increase the punishment for criminal acts, the amendment of Evidence Rule 404(a)(2) may be applied "retrospectively" without violating the prohibition on ex post facto laws).

**31.**  *See Landgraf v. USI Film Products*, 511 U.S. 244, 266 n. 19 (1994); *Collins v. Youngblood*,

497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) ("It is settled ... that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission; or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.").

**32.**  *See Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991) (stating that "where a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal").

**33.**  *See* Alaska Supreme Court Order No. 364 (August 1, 1979).

**34.**  *See Pulakis v. State*, 476 P.2d 474, 478 (Alaska 1970).

dence Rule 104(a) assigns to the trial court the duty to determine preliminary questions concerning the qualification of a person to be a witness and the admissibility of evidence. Evidence Rule 401 defines what evidence is relevant. Evidence Rule 403 allows exclusion of relevant evidence for such reasons as prejudice, confusion, and waste of time. Evidence Rule 702 allows experts to offer helpful opinion testimony.[35] Evidence Rule 703 allows experts to base opinions on facts or data of a type reasonably relied upon by experts in the field.[36] Thus, expert opinion evidence is admissible if the trial court (exercising its authority under Rule 104(a)) determines that (1) the evidence is relevant (Rule 401); (2) the witness is qualified as an expert (Rule 702(a)); (3) the trier of fact will be assisted (Rule 702(a)); (4) the facts or data on which the opinion is based are of a type reasonably relied upon by experts in the particular field in forming opinions upon the subject (Rule 703); and (5) the probative value of the evidence is not outweighed by its prejudicial effect (Rule 403).[37]

Nothing in our evidence rules requires or implies that any single criterion, let alone *Frye*'s general acceptance standard, controls admission of scientific opinion evidence. The commentary, which predated *Daubert*, observed that Evidence Rule 703 "attempts to chart a path between the rigid approach of [*Frye*] and the minimal relevance approach of Rule 401."[38] It also mentioned several *Daubert*-like factors and noted:

> Even though Rule 403 might be deemed sufficient protection against the dangers of relatively untested evidence, Rule 703 is drafted so as to remind trial judges that innovative attempts to offer expert evidence may involve evidence that is su-

perficially attractive, but which is problematic for one or more of the following reasons: ... 3) while the expert evidence is plainly relevant, the rate of error associated with the technique that produced the evidence is unknown and the trier of fact is therefore unable to properly evaluate the evidence; 4) the expert evidence is the subject of great controversy among the nation's experts and it would be inappropriate for a court or jury to resolve the controversy in any particular case. *See, e.g., People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976) (rejecting voiceprint evidence).[39]

Although the United States Supreme Court stated in *Daubert* that Federal Evidence Rule 702 is the "locus" for determining the admissibility of scientific evidence,[40] the commentary to the Alaska Rules of Evidence provides support for the State's view that Alaska Rule of Evidence 703 is also a source for an approach broader than the *Frye* standard.

■ Our evidence rules give trial courts both the authority and the responsibility to determine the admissibility of such evidence without being limited to the general acceptance standard. They preclude this inquiry from focusing exclusively on general acceptance or any other single factor. Our evidence rules contemplate a broader inquiry, allowing a proponent to establish admissibility even if general acceptance is absent, and allowing an opponent to challenge admissibility even if general acceptance is present.

*Frye* is potentially capricious because it excludes scientifically reliable evidence which is not yet generally accepted, and admits scientifically unreliable evidence which al-

---

**35.** Alaska Rule of Evidence 702(a) provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion [or] otherwise.

**36.** Alaska Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Facts or

data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

**37.** *See also State v. Alberico*, 116 N.M. 156, 861 P.2d 192, 202–04 (1993).

**38.** Alaska R. Evid. 703, commentary.

**39.** *Id.*

**40.** 509 U.S. at 589, 113 S.Ct. 2786.

though generally accepted, cannot meet rigorous scientific scrutiny. Because the *Frye* test potentially excludes evidence that should be admitted under our rules, and also potentially admits evidence that should be excluded under our rules, we conclude that it is both unduly restrictive and unduly permissive. Just as the Supreme Court concluded in *Daubert* that the *Frye* test is inconsistent with the federal evidence rules,[41] we conclude that it is inconsistent with the Alaska Rules of Evidence.

■ We reach this conclusion despite our prior approval of the *Frye* standard. "[T]he judicial doctrine of stare decisis accords the prior holdings of the highest courts of this State precedential value while still permitting the reconsideration of legal issues when conditions warrant." [42]

■ We have stated that we will overrule a prior decision only when we are "clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent." [43] It is our view that these requirements are met with respect to our decision in *Contreras*.

First, we are clearly convinced that we erroneously decided *Contreras* for the following reasons. *Contreras* assumes that the Federal Rules of Evidence did not change the *Frye* test. *Daubert* has subsequently shown that assumption to be incorrect. Further, our decision in *Contreras* ignored Alaska Evidence Rule 703, which employs a "rea-

sonably relied upon by experts" standard in contrast to *Frye*'s "general acceptance" standard. This oversight in *Contreras* is all the more surprising because the commentary to the Rule 703 makes clear an intent to promulgate a rule different from *Frye*: "The rule attempts to chart a path between the rigid approach of [*Frye*] and the minimal relevance approach of Rule 401."

Second, we conclude that the "more good than harm" requirement is also met. As noted above, *Frye* may exclude scientifically reliable evidence while admitting unreliable evidence. It is desirable to replace *Frye* with a rule not suffering from these deficiencies. Any harm as may be done by overruling *Contreras* is short term and limited. It concerns only cases in which the *Frye/Daubert* controversy has been raised that are pending in the trial courts or on direct review at the time of this decision.[44] In those cases, if reliance on *Frye* is found to be other than harmless error, a new trial may be required. But a new trial may not be necessary, because on remand the trial court may determine that the questioned evidence meets the standard set out in this opinion.

The limitations of the general acceptance standard have been extensively catalogued.[45] Assuming that some of the strictures of *Frye* were ameliorated in some courts pre-*Daubert*,[46] we nonetheless conclude that it is better to resolve admissibility disputes by referring to our modern evidentiary foundation, the Alaska Rules of Evidence, than by trying

---

**41.** *See id.*

**42.** *State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 953 (Alaska 1995); *see also Pratt & Whitney Canada, Inc. v. Sheehan*, 852 P.2d 1173, 1175–76 (Alaska 1993).

**43.** *State v. Fremgen*, 914 P.2d 1244, 1245 (Alaska 1996).

**44.** *See Yerrington v. Anchorage*, 675 P.2d 649 (Alaska App.1983).

**45.** *See* Kesan, *Autopsy, supra* note 3, at 1191–92; Giannelli, *Novel Scientific Evidence, supra* note 25, at 1208–31; *see also Daubert*, 509 U.S. at 586 n. 4, 113 S.Ct. 2786 (listing articles debating the merits of *Frye* ).

**46.** For example, in California one must satisfy the *Frye/ Kelly* test to introduce expert testimony by showing: (1) that the technique or method is sufficiently established to have gained general acceptance in its field; (2) that the expert is properly qualified; and (3) that correct scientific procedures have been used in the particular case. *See People v. Leahy*, 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 882 P.2d 321, 324–25 (1994) (referring to test announced in *People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976)).

Also, even before the Court announced *Daubert*, some federal appellate courts had rejected the *Frye* test and adopted multifactor reliability tests. *See, e.g., United States v. Downing*, 753 F.2d 1224, 1238–39 (3d Cir.1985); *United States v. Williams*, 583 F.2d 1194, 1198–99 (2d Cir. 1978).

to salvage or remold a "rigid" standard that is fundamentally inconsistent with our rules.

How should Alaska trial courts assess the reliability and relevance of proffered scientific evidence? The factors identified in *Daubert* provide a useful approach: (1) whether the proffered scientific theory or technique can be (and has been) empirically tested (i.e., whether the scientific method is falsifiable and refutable); (2) whether the theory or technique has been subject to peer review and publication; (3) whether the known or potential error rate of the theory or technique is acceptable, and whether the existence and maintenance of standards controls the technique's operation; and (4) whether the theory or technique has attained general acceptance.[47]

Other factors may apply in a given case. After the Supreme Court issued its decision in *Daubert*, the Ninth Circuit suggested two ways to satisfy *Daubert*'s requirement that the testimony be "derived by the scientific method [or] . . . based on scientifically valid principles."[48] As described by Kesan, "either (a) the expert's proffered testimony must grow out of prelitigation research, or (b) the expert's research must be subjected to peer review."[49] Kesan, giving the example of "independent" research funded by tobacco companies, appropriately notes the danger of a hidden litigation motive.[50] Nonetheless, publication is at least more likely to provoke scrutiny and response, and reveal methodological deficiencies.

Alaska Evidence Rule 702 is similar to New Mexico's equivalent rule.[51] In 1993 the New Mexico Supreme Court adopted the *Daubert* standard in *State v. Alberico*, 116 N.M. 156, 861 P.2d 192, 203–04 (1993). Other state supreme courts with similar evidence rules have also adopted the *Daubert* standard.[52]

But other states, whose evidence rules also mirror the federal rules, have rejected *Daubert* and retained *Frye*.[53] California and New York courts have also retained a *Frye*-type standard; they have no rule similar to Alaska Evidence Rule 702.[54] Those decisions do not convince us that we should retain *Frye*.

In invoking our evidence rules, adopting *Daubert*, and limiting *Frye*, we reject arguments and dire predictions supporting the status quo.

*Burden on trial judges.* We first reject concerns that *Daubert* will make the trial courts' gatekeeping role unduly burdensome. This concern is founded on a perception that *Daubert* requires judges to determine the reliability of the expert's scientific methods, whereas the general acceptance standard allows courts to defer to the judgment of scientists.[55]

The notion that scientists are better suited than judges for assessing scientific reliability may appear initially persuasive, given that

47. *See* 509 U.S. at 593–94, 113 S.Ct. 2786.

48. *Daubert v. Merrell Dow Pharm., Inc.*, (*Daubert IV*), 43 F.3d 1311, 1316 (9th Cir.1995).

49. Kesan, *Autopsy, supra* note 3, at 2003 (citing *Daubert IV*, 43 F.3d at 1318).

50. *See id.* at 2002.

51. *See* Alaska R. Evid. 702, commentary.

52. *See Cecil v. Commonwealth*, 888 S.W.2d 669, 674–75 (Ky.1994); *State v. Foret*, 628 So.2d 1116, 1121, 1123 (La.1993); *Commonwealth v. Lanigan*, 419 Mass. 15, 641 N.E.2d 1342, 1348–49 (1994); *State v. Brooks*, 162 Vt. 26, 643 A.2d 226, 229 (1993); *Mayhorn v. Logan Med. Found.*, 193 W.Va. 42, 454 S.E.2d 87, 90–93 (1994).

53. *See Flanagan v. State*, 625 So.2d 827, 828–29 & n. 2 (Fla.1993); *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763, 778–79 (1994), *overruled on other grounds by State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276, 293 (1997); *State v. Riker*, 123 Wash.2d 351, 869 P.2d 43, 47–48 & n. 1 (1994).

54. *See People v. Leahy*, 8 Cal.4th 587, 34 Cal. Rptr.2d 663, 882 P.2d 321, 325 (1994); *People v. Wesley*, 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451, 454 & n. 2 (1994).

55. *See* Kesan, *Autopsy, supra* note 3, at 2000; *Daubert IV*, 43 F.3d at 1316 ("As we read the Supreme Court's teaching in *Daubert*, . . . though we are largely untrained in science and certainly no match for any of the witnesses whose testimony we are reviewing, it is our responsibility to determine whether those experts' proposed testimony amounts to 'scientific knowledge,' constitutes 'good science,' and was 'derived by the scientific method.' ").

trial judges are rarely trained in science and given concerns that they are already overburdened. Closer consideration reveals that the notion is misleading and irrelevant. First, scientific reliability is not necessarily congruent with judicial reliability. This is illustrated by *Frye* itself. The "general acceptance" standard does not define scientific reliability; it is simply a judicial construction. And for reasons noted above, it is a flawed judicial construction. Second, the rules of evidence must be applied by trial judges, subject to review for abuse of discretion. It is for the trial court to determine whether the expert is qualified to testify and the proffered evidence is admissible.[56] Determining reliability for judicial purposes is unavoidably the responsibility of trial courts, and should not be delegated to an expert's peers.

The burden, especially when considering novel scientific evidence, may well be substantial. We nonetheless conclude that it is one the trial courts (and appellate courts on review) must bear. But we are not convinced that the burden will be as onerous as some predict. We suspect that most difficult disputes will be limited to evidence that is rationally disputable; we expect that relatively little effort will be required to determine the admissibility of most scientific evidence, because most will be either patently reliable or unreliable.

As for the difficult disputes, the courts may reduce the judicial burden and increase the accuracy of their admissibility decisions by selecting independent expert witnesses.[57] They can also appoint expert advisors.[58] Such advisors can provide valuable guidance to courts determining reliability of proffered scientific evidence. Commentators have identified various concerns about using technical advisors.[59] Their suggestions—how to select an advisor, how to define the expert's duties, and how the expert should act—are worthy of consideration.[60]

*"Junk science."* Several amici argue that juror susceptibility to the persuasive power of scientific evidence mandates a conservative reliability standard, such as *Frye*'s general acceptance test, to prevent admission of "junk science."[61]

In *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763, 777–78 (1994), the Nebraska Supreme Court stated that the *Frye* rule was intended to ensure the reliability of scientific evidence because: (1) lay jurors can be overly impressed by science; (2) lay jurors lack the capacity to evaluate scientific evidence critically; and (3) lay jurors are likely to give "junk science" more weight than it deserves. The court, citing New Mexico and Arizona decisions, recognized "the complex nature of

---

**56.** *See* Alaska R. Evid. 104(a).

**57.** Alaska Evidence Rule 706 provides in pertinent part:

(a) Appointment. The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint expert witnesses. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. If the court determines that the interests of justice so require, the party calling an expert appointed under this rule may cross-examine the witness.
*See also Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.

**58.** *Compare Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (possibly implying that Evidence Rule 706 also governs appointment of non-witness advisors), *with In re Peterson*, 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920) (recognizing courts' "inherent power" to appoint persons not connected with the court to aid judges in the performance of specific judicial duties).

**59.** *See* Note, *Improving Judicial Gatekeeping, supra* note 25.

**60.** *See id.* at 954–58.

**61.** *See generally People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240, 1245 (1976) ("Lay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials. We have acknowledged the existence of a '... misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.'") (citations omitted); *see also Contreras v. State*, 718 P.2d 129, 135 (Alaska 1986).

DNA evidence and the need to protect against unproven and potentially erroneous and misleading evidence," and declined to adopt the *Daubert* standard for the admissibility of DNA evidence.[62]

The *Frye* test is arguably a safeguard against evidence based upon specious scientific techniques, especially in criminal trials where the defendant's right to a fair trial is crucial.[63] Nevertheless, the *Frye* standard has also been criticized for being easily manipulated by courts when deciding whether or not to admit certain evidence. "The lack of a definitional framework for 'field' and 'general acceptance' allowed courts seeking to admit scientific evidence to confine the 'field' of pertinent inquiry narrowly to a specialty within a broader scientific discipline in order to demonstrate 'general acceptance.'" [64] For example, in *Commonwealth v. Lykus*, 367 Mass. 191, 327 N.E.2d 671, 675–78 (1975), the record contained evidence of a dispute about the acceptance of voice spectrography in the scientific community; the court resolved the dispute by limiting the applicable scientific community to "those who would be expected to be familiar with its use." [65]

We are not convinced that "junk science" is more likely to be admitted under *Daubert* than under *Frye*. Post-*Daubert* reported decisions suggest that courts are acting with restraint, and are giving rigorous consideration to the reliability of scientific evidence.[66] Furthermore, *Frye* also potentially permits admission of unreliable scientific evidence, because a methodology that has been generally accepted might nonetheless have been discredited during a *Daubert* inquiry.

We also suspect that junk science poses less risk to fair trials than a more common aspect of admitting scientific evidence. Even when they apply identical methodologies that satisfy both *Daubert* and *Frye*, dueling experts can reach conflicting, irreconcilable conclusions. Indeed, *Daubert* has been criticized because it assumes that reliability should be determined by examining the methodology, without regard to the truth of the scientific conclusions.[67] Even when they apply the same methodology, experts for opposing parties may reach different results. Likewise, well-qualified experts may make rational conflicting choices in deciding which reliable methodology to apply. Juries, relatively ill-trained to resolve such conflicts on subtle or complex scientific grounds, may resort to credibility assessments which are unduly simplistic. Opinions of a practiced forensic expert may prevail over those of a true academic who makes a less impressive appearance on the witness stand. Assuming proper execution of the judicial gatekeeping function, we think the risk to fair trials posed by junk science is lower than the risk posed by jurors' difficulty in critically assessing scientific evidence that is based on reliable methodologies.

*Relitigation of evidence admissible under Frye.* Butler's amicus brief asserts that since the *Daubert* standard applies to all scientific knowledge, and is not limited to "novel" scientific evidence, evidence deemed admissible under *Frye* may now be found inadmissible under *Daubert*. Butler argues that this will lead to increased litigation over the admissibility of scientific evidence, and to a case-by-case determination of admissibility, with the possibility of inconsistent or unpredictable decisions. Butler suggests that *Daubert* may

**62.** *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763, 779 (1994).

**63.** *See* Giannelli, *Novel Scientific Evidence, supra* note 25, at 1207.

**64.** Kesan, *Autopsy, supra* note 3, at 1991.

**65.** *See also Alberico*, 861 P.2d at 201 (noting that the *Frye* test is easily manipulated because it is so vague).

**66.** *See, e.g., Duffee v. Murray Ohio Mfg. Co.*, 879 F.Supp. 1078, 1086–87 (D.Kan.1995) (excluding expert testimony because it was devoid of a

meaningful and factual basis for weighing the factors involved in the design of a product in defective design case), *aff'd*, 91 F.3d 1410 (10th Cir.1996); *Richardson v. United States*, 835 F.Supp. 1236, 1239–41 & n. 1 (E.D.Wash.1993) (excluding testimony of automobile accident reconstructionists because their computations lacked fixed factors based on on-the-scene measurements and their conclusions were opinion-driven).

**67.** *See* Schwartz, *Dogma of Empiricism supra* note 25, at 156–57.

affect forensic sciences, such as fingerprint, handwriting, and hair comparison analyses, that are now admissible under *Frye*. While Butler frames this as a negative result of adopting *Daubert*, the New Mexico Supreme Court noted:

> Contrary to the assertion ... that the *Frye* test places the responsibility of determining scientific validity upon scientists, in practice too many courts reference reported case law to determine what is generally accepted in the scientific community. It is improper to look for scientific acceptance only from reported case law because that amounts to finding a consensus in the legal community based on scientific evidence that is sometimes many years old.[68]

Further, as the State notes, when an area of expertise is well-known and has been fully considered by the courts, a trial court may take judicial notice of its admissibility. The Supreme Court advocated this approach.[69] Moreover, general acceptance remains a factor under *Daubert*.[70] It also seems unlikely that methodologies that were admitted under *Frye* and that remain generally accepted in the appropriate community will be excluded, absent affirmative evidence of unreliability.

### D. The Admissibility of Voice Spectrograph Evidence under Daubert

On remand, the trial court found that Cain's testimony regarding the applied forensic technique of using spectrography to analyze and identify voices was admissible under both *Frye* and *Daubert*. Coon and the APDA contend that the trial court erred in

finding Cain's testimony regarding voice spectrography admissible under either test. Given our adoption of *Daubert* in Part III.C, there is no reason to review admissibility under *Frye*.

### 1. Standard of review

We review a trial court's ruling on the admissibility of expert testimony for abuse of discretion.[71]

Although the parties agree on this standard of review, two amici curiae, Butler and the APDA, argue that we should review de novo a trial court's decision to admit or exclude scientific evidence. So arguing, APDA relies on a passage from *Pulakis*, where we stated that "[o]n the basis of our study of the judicial authority and academic literature in this area, we conclude that the results of polygraph examinations should not be received in evidence over objection."[72]

In addition, both Butler and APDA cite *Contreras*, in which the court of appeals stated that it was "free to exercise [its] independent judgment" when reviewing the trial court's decision to admit evidence recovered from an eyewitness during hypnosis because the findings regarding memory and the effects of interrogative techniques on eyewitness testimony and hypnosis in general are legislative facts, rather than adjudicative facts.[73]

Kesan and the dissenting opinion propose adopting a hybrid standard of review, reviewing de novo a trial court's findings on the scientific knowledge prong of the *Daubert* test and retaining an abuse of discretion

---

**68.** *Alberico*, 861 P.2d at 203.

**69.** *See Daubert*, 509 U.S. at 592 n. 11, 113 S.Ct. 2786; *see also* Giannelli, *Novel Scientific Evidence, supra* note 25, at 1202.

**70.** *See* 509 U.S. at 594, 113 S.Ct. 2786.

**71.** *See Sweet v. Sisters of Providence in Wash.*, 895 P.2d 484, 494 n. 10 (Alaska 1995); *see also Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980) ("The admissibility of evidence is largely within the trial court's discretion and its rulings will not be overturned on appeal in the absence of an abuse of discretion.").

**72.** 476 P.2d at 479.

**73.** 674 P.2d at 799 & n. 11. *See also State v. Copeland*, 130 Wash.2d 244, 922 P.2d 1304, 1314–15 (1996) (holding that review of admissibility under the *Frye* test is de novo and involves a mixed question of law and fact). *But see State v. Alberico*, 116 N.M. 156, 861 P.2d 192, 205–06 (1993) (noting that although the abuse of discretion standard "lends itself to the criticism that it will lead to inconsistent results in lower courts throughout the state," abuse of discretion is the proper standard when reviewing a trial court's decision to admit scientific evidence under *Daubert* because appellate courts may not have the same access to the most recent data concerning the scientific method).

standard for the second prong relating to relevance or "fit" of the facts of the particular case to the scientific technique employed.[74] They assert that implementing de novo review of scientific validity allows for more uniform adjudication at the trial and appellate levels, and for development of distinct validation criteria for expert testimony relating to different scientific or technical disciplines.[75]

We see no present reason to adopt a new or hybrid standard for reviewing rulings on the admissibility of scientific evidence. Abuse of discretion is the standard applicable to other evidentiary rulings.[76] Such rulings are best left to the discretion of the trial court. A determination of reliability under *Daubert* is no different.

The dissent reaches a different conclusion because it begins with the premise that the scientific validity of a technique is a legal issue which does not turn on case-sensitive facts.[77] This premise does not adequately take account of the reality of the judicial process and the variable state of science. The New Mexico Supreme Court rejected the same argument advanced here by the dissent. In rejecting the de novo standard of review that court noted:

> This reasoning assumes, however, that the record on appeal contains all of the relevant, most recent data concerning the scientific method, and that assumes too much. It also assumes that there is always a reservoir of scientific literature that an appellate court might independently reference in a de novo review. The abstract validity of a scientific technique should not

vary from court to court, but how the proof of such validity is communicated will often vary from presentation to presentation. Some experts are more skillful and more well-informed than others just as some lawyers are more skillful and more well-prepared than others. In addition, the state of science is not constant; it progresses daily. For example, what might have been true about [post traumatic stress disorder] in the early 1980s when it was first addressed in published opinions might not have been true in 1992. . . . [78]

We recognize that different trial judges, in exercising their discretion, may reach different conclusions about scientific reliability. But we disagree with the dissent's suggestion that the inconsistency will be of such magnitude as to "compromise the integrity of the judiciary in the eyes of the public." [79] Despite such predictions in the academic literature, the majority of the federal circuits have chosen to apply the abuse of discretion standard when reviewing district court decisions under *Daubert*.[80] In addition, the Supreme Court recently approved the abuse of discretion standard in *General Electric, Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997).

The principal reason for adopting the *Daubert* standard is to give the courts greater flexibility in determining the admissibility of expert testimony, so as to keep pace with science as it evolves. We think the abuse of discretion standard of review best comports with these aims, and we choose to apply it here.

**74.** *See* Kesan, *Autopsy, supra* note 3, at 2038–39; Dissent at 403–404.

**75.** *See* Kesan, *Autopsy, supra* note 3, at 2038–39; Dissent at 403.

**76.** *See Harris v. Keys*, 948 P.2d 460, 466 (Alaska 1997) ("This court reviews the superior court's decisions on the admissibility of evidence for an abuse of discretion.") (citation omitted); *Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 359 n. 5 (Alaska 1996) ("A trial court's evidentiary rulings are reviewed under the abuse of discretion standard.") (citation omitted).

**77.** *See* Dissent at 403.

**78.** *Alberico*, 116 N.M. at 169–70, 861 P.2d 192.

**79.** Dissent at 404.

**80.** *See generally, United States v. Kayne*, 90 F.3d 7, 11 (1st Cir.1996); *Raskin v. Wyatt, Co.*, 125 F.3d 55, 65–66 (2d Cir.1997); *Benedi v. McNeil–P.P.C.*, 66 F.3d 1378, 1384 (4th Cir.1995); *Pedraza v. Jones*, 71 F.3d 194, 197 (5th Cir.1995); *American & Foreign Ins. Co. v. General Elec. Co.*, 45 F.3d 135, 137 (6th Cir.1995); *Hose v. Chicago N.W. Transp. Co.*, 70 F.3d 968, 972 (8th Cir. 1995); *United States v. Chischilly*, 30 F.3d 1144, 1152 (9th Cir.1994); *Duffee, Thornton v. Murray Ohio Mfg. Co.*, 91 F.3d 1410, 1411 (10th Cir.); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C.Cir.1993).

2. *Admissibility of Cain's voice spectrographic analysis under Daubert*

In making its findings on remand, the trial court discussed each factor the Supreme Court articulated in *Daubert*. The trial court found that the technique of spectrographic voice identification had been empirically tested "on numerous occasions by many scientists during approximately the past twenty years." The court determined that voice spectrography had been subjected to peer review and publication, but noted that the technique's reliability was debated in the scientific literature. It also found that when properly performed under the "stringent standards" of the International Association for Identification by a qualified, trained scientist or technician, voice spectrography has a known error rate of less than one percent. The trial court found that because voice spectrography has been subjected to empirical testing, it is both falsifiable and refutable, and that testing has not refuted the technique or shown that it is falsified. The court determined that when voice spectrography is properly performed by a qualified person, it has attained widespread acceptance within the relevant scientific community—amongst forensic scientists and scientists in acoustics and speech-related fields with experience using the technique.

The trial court also found that the reasoning and methodology underlying Cain's testimony were scientifically valid, and that Cain had properly performed the voice spectrographic analysis in this case. The trial court stated that Cain's testimony was relevant in that it assisted the jury in determining a key issue at trial, namely the identification of the person who left the threatening messages on Deborah Rudolph's answering machine. The trial court therefore concluded that Cain's testimony was sufficiently relevant and reliable to be admitted under *Daubert*.

The trial court made these findings on remand after reviewing the record, including Cain's testimony.

██ Because this is our first review of a trial court's application of *Daubert*, we discuss Cain's evidence at some length. Cain testified at the 1992 hearing about his qualifications as a voice spectrograph expert. He has a bachelor of science degree in engineering and two master's degrees in forensic science; he had completed two years of work toward a doctoral degree in criminology. He had continued his post-graduate education by attending seminars at the state and national levels dealing with tape examination and other aspects of forensic evidence analysis. He had given talks and seminars throughout the United States on voice identification and tape analysis and had published "a number of articles" concerning the legal aspects and results of research studies on the reliability of voice spectrograph analysis.

He owned and operated Applied Forensic Technologies International, Inc., a forensic laboratory that analyzes physical evidence. Before opening his private laboratory, Cain worked for ten years as a document and voice print examiner for the Secret Service in its Washington, D.C., crime laboratory, and for three years for the Internal Revenue Service as a supervisor at its Illinois Crime Lab, where he started a voice identification program.

He was certified by the International Association for Identification (IAI) as a voice identification specialist and he served on the certification board of that organization. Based on this testimony offered outside the jury's presence, the trial court found that Cain was qualified as an expert under Alaska Evidence Rule 702 in the field of "applied forensic techniques of voice prints."

Cain then explained that in performing a voice analysis, he conducts both an aural and a spectrographic analysis of a voice. Cain discussed factors which might affect the results of voice analysis, the potential error rate of voice analysis, and the reliability of the technique. He described the standards adopted by the IAI in 1992, and stated that he adhered to these standards, and that he sends his work to another examiner for an independent review of the accuracy of his findings. Cain estimated that approximately thirty-one to thirty-four states have accepted voice spectrograms, commonly known as voiceprints, as a positive means of forensic identification. Cain testified that voice spectrographic analysis has been subjected to

empirical testing from the time of its inception over twenty years prior. Cain testified about various scientific studies that concluded that voice spectrographic analysis was a valid and reliable forensic identification technique.

The scientific literature submitted to us by amicus APDA would also support a finding that spectrographic analysis has been empirically tested. We conclude that the trial court did not err in finding on remand that this technique has been subjected to empirical testing.

Cain conceded that several studies question the validity and reliability of the technique. Although many of the studies questioned the reliability of the technique, the trial court did not err in finding on remand that the technique had been subjected to peer review and publication, since a general consensus is not a mandatory requirement under *Daubert.*

Cain also testified that research studies have calculated the known error rate for voice spectrographic analysis to be less than one percent when the technique is performed properly by a scientist skilled in the technique.[81] Cain stated that in order to make the sample as accurate as possible by eliminating "intraspeak variation" (the internal factors that affect a person's voice, such as the time of day, the amount a person has eaten, or the person's mood), the scientist conducting the analysis should take numerous exemplars and attempt to duplicate the conditions of the original recording. The trial court did not err in finding on remand that the known error rate for voice spectrographic analysis performed properly by a skilled scientist in the field was sufficiently low to make this evidence reliable.

General acceptance remains a factor under *Daubert.* The trial court on remand found that "[t]he technique of voice identification using spectrography when properly performed by a qualified person has attained widespread acceptance within a relevant scientific community—forensic scientists and scientists in acoustics and speech related fields who had experience using the technique."

In determining the admissibility of voice spectrograph evidence under the general acceptance test, several courts have defined the composition of the "relevant scientific community." In *State v. Gortarez,* 141 Ariz. 254, 686 P.2d 1224, 1233 (1984), the Arizona Supreme Court defined the relevant scientific community as "disinterested and impartial experts in many fields, possibly including acoustical engineering, acoustics, communications electronics, linguistics, phonetics, physics, and speech communications." The *Gortarez* court noted that this list was merely suggestive and not all-inclusive.[82]

Neither party questions the trial court's determination of the relevant scientific community in this case. Based upon the findings of other courts as to the relevant scientific community for the technique of forensic voice identification using spectrography, we conclude that the trial court did not abuse its discretion in determining the relevant scientific community.

Coon and the APDA argue that voice spectrograph analysis is not generally accepted within the relevant scientific community, and has been ruled inadmissible by numerous courts applying *Frye.* The APDA has submitted several articles questioning the reliability of voice spectrograph analysis when used as anything other than an investigative tool. The APDA also included a copy of an Alaska superior court decision in *State v. Gomez,* No. 3AN–S88–5190 Cr. (March 23, 1990), in which Superior Court Judge Joan M. Katz found that voice spectrographic identification evidence was inadmissible because it was not

---

81. *See also* Bruce E. Koenig, *Spectrographic Voice Identification,* 13 FBI Crime Lab. Digest 105, 115 (1986).

82. *See State v. Gortarez,* 141 Ariz. 254, 686 P.2d 1224, 1233 n. 4 (1984). *See also United States v. Smith,* 869 F.2d 348, 352 (7th Cir.1989) (defining the relevant scientific community as including "not only those who utilize spectrographic voice identification techniques, but linguists, psychologists and engineers as well" (footnote omitted)); *Cornett v. State,* 450 N.E.2d 498, 503 (Ind.1983) (defining the relevant scientific community as "linguists, psychologists, and engineers, in addition to the people who use voice spectrography for identification purposes").

generally accepted within the relevant scientific community.

■ In determining whether evidence is generally accepted within the scientific community, courts have generally looked to three sources for guidance: (a) judicial opinions; (b) scientific literature; and (c) expert testimony presented at an evidentiary hearing.[83]

Under *Frye* many courts have determined that voice spectrographic evidence is not admissible.[84] But other courts have allowed voice spectrographic evidence under standards other than *Frye*.[85] And several courts purporting to apply *Frye* have also allowed such evidence.[86] Overall, it is inconclusive whether there is a judicial consensus that voice spectrographic evidence is generally accepted within the relevant scientific community.

The scientific literature cited by the APDA permits a conclusion that there is significant disagreement among experts in the field of voice spectrographic analysis regarding the reliability of the technique. As the State notes, no scientific literature was submitted to the trial court for review, but Cain testified about several articles and studies addressing voice spectrographic analysis, and conceded that the reliability of the technique was disputed among members of the relevant scientific community.

Cain cited, among others, a study conducted in 1986 by Bruce E. Koenig of the Federal Bureau of Investigation. Koenig there noted that in a survey of 2,000 voice identification comparisons made by FBI examiners under actual forensic conditions, meaningful decisions were made only 34.8% of the time, with a known error rate of 0.31% for false identifi-

cations and 0.53% for false eliminations, with an overall error rate of 0.43%.[87] In a 1993 article, Koenig noted that problems still persist in the spectrographic voice identification field, such as "separate sets of certified examiners making high confidence decisions for both identification and elimination in the same case."[88] Koenig also stated that even with the establishment of new standards by the IAI in 1992, the use of spectrographic voice technique is on the decline, and "[t]he most important legal difference is the FBI's policy not to provide testimony on spectrographic comparisons due to the inconclusive nature of the examination and the unknown error rate under specific investigative conditions."[89]

Although it is not clear that voice spectrographic analysis has attained general acceptance within the relevant scientific community, we do not find that the trial court clearly erred in making its general acceptance finding, or abused its discretion in ruling that the evidence satisfied *Daubert*. Consequently, we conclude that the trial court did not err in finding the voice spectrographic evidence admissible under *Daubert*. It therefore did not abuse its discretion in admitting this evidence at Coon's trial.

## IV. *CONCLUSION*

For these reasons, we overrule *Contreras*, and hold that the Alaska Rules of Evidence supersede the *Frye* test.

We adopt the *Daubert* standard for determining the admissibility of scientific evidence. We hold that the voice spectrograph analysis evidence was admissible under *Daubert* and the Alaska Rules of Evidence in this

**83.** *See, e.g., Windmere, Inc. v. International Ins. Co.,* 105 N.J. 373, 522 A.2d 405, 408 (1987).

**84.** *See, e.g., Gortarez,* 686 P.2d at 1236; *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240, 1251 (1976); *Cornett,* 450 N.E.2d at 503; *People v. Tobey,* 401 Mich. 141, 257 N.W.2d 537, 538–40 (1977); *Windmere,* 522 A.2d at 408–12.

**85.** *See, e.g., United States v. Williams,* 583 F.2d 1194, 1198–1201 (2d Cir.1978); *United States v. Baller,* 519 F.2d 463, 465–67 (4th Cir.1975); *United States v. Franks,* 511 F.2d 25, 32–34 (6th Cir.1975).

**86.** *See, e.g., United States v. Smith,* 869 F.2d 348, 353 (7th Cir.1989); *United States v. Maivia,* 728 F.Supp. 1471, 1473–74 (D.Haw.1990).

**87.** *See* Bruce E. Koenig, *Spectrographic Voice Identification,* 13 FBI Crime Lab. Digest 105, 115 (1986).

**88.** Bruce E. Koenig, *Selected Topics in Forensic Voice Identification,* 20 FBI Crime Lab. Digest 78, 80 (1993).

**89.** *Id.* at 80, 81.

case. We therefore AFFIRM Coon's judgment and conviction.

BRYNER, Justice, not participating.

FABE, Justice, concurring in part, and dissenting in part.

I agree with the court's decision to adopt the test for admissibility of scientific evidence articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[1] as the rule in Alaska. As the court points out, scientific evidence must be both reliable and relevant to be admissible under *Daubert*. But I disagree with the court's decision to apply an abuse of discretion standard of review to rulings about scientific reliability. The determination of whether a general scientific proposition or process is reliable should not vary from case to case or from judge to judge. I would adopt a hybrid standard that reviews the reliability of scientific evidence de novo but permits the trial court greater discretion in deciding the relevance of that evidence to the particular facts of a case.

The court adopts *Daubert*'s two-pronged approach to answering the question of whether scientific evidence is both reliable and relevant. The trial judge must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue."[2] Thus, the court recognizes that the question of whether a certain technique is scientifically valid, and thus evidentiarily reliable,[3] is distinct from the question of whether the technique would help the trier of fact in a given case. For example, even if a court decides that a scientific technique such as polygraph testing is valid, the technique might not be relevant to the disputed issues in the case.

Yet the court today adopts an abuse of discretion standard for reviewing rulings as to both the validity of scientific evidence *and* the relevance of such evidence to the facts of a given case. Although I agree that abuse of discretion is an appropriate standard for reviewing trial courts' decisions regarding the relevance of scientific evidence to particular cases, such a standard is inappropriate as applied to rulings on the validity of general scientific principles, techniques, or theories. Because Alaska courts should be consistent in their rulings with regard to the validity of such techniques, and because the question of a technique's scientific validity is a legal issue that normally does not depend on case-sensitive factual determinations, I advocate a hybrid standard under which we would review de novo any threshold rulings on scientific validity but would review for abuse of discretion case-specific rulings on relevance and testing performance.[4]

---

1. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

2. Op. at 390 (quoting *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786).

3. The *Daubert* Court explained the subtle difference between validity and reliability:

   We note that scientists typically distinguish between "validity" (does the principle support what it purports to show?) and "reliability" (does application of the principle produce consistent results?).... [O]ur reference here is to *evidentiary* reliability—that is, trustworthiness. In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*.

   509 U.S. at 590 n. 9, 113 S.Ct. 2786.

4. Several legal commentators have suggested such a hybrid standard of review. *See, e.g., Developments in the Law: Confronting the New Challenges of Scientific Evidence,* 108 Harv. L.Rev. 1509, 1528 (1995) ("[C]ourts should consider developing a hybrid approach in which appellate courts review de novo those decisions involving general scientific propositions, but allow trial courts greater discretion with regard to the particular facts of each case."); David L. Faigman et al., *Check Your Crystal Ball at the Courthouse Door, Please: Exploring the Past, Understanding the Present, and Worrying About the Future of Scientific Evidence,* 15 Cardozo L.Rev. 1799, 1822 (1994) (advocating de novo review for scientific knowledge that transcends individual cases but abuse of discretion review for questions of witness competency); Michael H. Gottesman, *From Barefoot to Daubert to Joiner: Triple Play or Double Error?,* 40 Ariz. L.Rev. 753, 776–80 (1998) (listing the dangers of applying abuse of discretion review to *Daubert* rulings); Jay P. Kesan, *An Autopsy of Scientific Evidence in a Post–Daubert World,* 84 Geo. L.J.1985, 2038 (1996) ("Examination of scientific theories or methodologies to determine whether they have evolved sufficiently to amount to scientific knowledge is a task that lends itself to de novo appellate review.").

Application of an abuse of discretion standard of review to the validity of scientific techniques will most likely lead to inconsistent treatment of similarly situated claims.[5] We should strive to avoid such inconsistency for the sake of both litigants and the courts. The existence of conflicting superior court rulings on the admissibility of a certain scientific theory or technique will not only hinder efforts to provide uniformity under the Alaska Rules of Evidence but will also decrease litigants' ability to predict future rulings and to prepare efficiently and conscientiously for future litigation involving expert scientific testimony.[6] Moreover, one commentator has suggested that such inconsistency among trial courts may compromise the integrity of the judiciary in the eyes of the public:

> This nonuniformity, however, must not be allowed to fester and must be reconciled at the appellate level. Otherwise, inconsistent jury verdicts, widely disparate compensation for similar injuries, and erroneous criminal verdicts will continue to erode public confidence in our justice system.[7]

The desire for uniformity in decisions regarding the admissibility of expert scientific testimony does not stem from a concern about trial judges' competency to decide sophisticated scientific questions. As the court acknowledges, two conscientious judges with experience adjudicating disputes involving questions of science can come to well-reasoned yet conflicting decisions rejecting or accepting scientific information as evidence.[8] The court believes such inconsistencies will not be of a problematic magnitude.[9] I hope this optimistic view proves correct. But if it does not, then parties preparing for litigation will not be able to predict with confidence which techniques and theories Alaska courts will view as "real science."[10] The only way to ensure such consistency is to allow appellate courts to review *Daubert* rulings de novo with respect to the scientific validity of such techniques and theories.[11]

Moreover, decisions about the validity of a general scientific theory or principle normally do not turn on an assessment of the credibility of witnesses or other decisions within the exclusive province of the trial judge. The reliability of scientific evidence does not

---

5. *See* Alan W. Tamarelli, Jr., *Daubert v. Merrell Dow Pharmaceuticals: Pushing the Limits of Scientific Reliability—The Questionable Wisdom of Abandoning the Peer Review Standard for Admitting Expert Testimony*, 47 Vand. L.Rev. 1175 (1994):

> If Daubert decisions are reviewed [for abuse of discretion], inconsistent decisions concerning the admissibility of novel scientific testimony may go unchecked from ... judge to judge. This inconsistent standard of review inevitably may ... confound efforts to provide uniformity under the Rules.

*Id.* at 1196.

6. *See* Faigman et al., *supra* note 4, at 1822 ("The validity of scientific knowledge does not change from court to court; assessments of that knowledge also should not change from court to court.").

7. Kesan, *supra* note 4, at 2037. Michael Gottesman notes that, in the wake of the Supreme Court's decision in *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), directing federal courts to apply the abuse of discretion standard, such inconsistency could undermine the integrity of the courts:

> This [inconsistency in district courts in light of *Joiner*] will be disquieting, if not promotive of a general disrespect within the populace for the integrity of federal judges. Of course, variance between courtrooms would be predicta-

ble even if these issues were given to juries in every case, but disagreement among juries is likely to be less offensive to shared communal values than sanctioned disagreement among judges.

Gottesman, *supra* note 4, at 778.

8. Op. at 399. The flexible nature of the *Daubert* criteria allows more inconsistency among judges than the comparatively rigid *Frye* standard. *See* Kaushal B. Majmudar, *Daubert v. Merrell Dow: A Flexible Approach to the Admissibility of Novel Scientific Evidence*, 7 Harv. J.L. & Tech. 187, 204 (1993) (noting the potential for inconsistency and the irony that "the main reason offered by the Court for its grant of certiorari [in *Daubert*] was that the lower courts had been inconsistent in their methods and results").

9. Op. at 399.

10. This uncertainty may be especially troubling in criminal cases in which a defense theory rests primarily on the admissibility of scientific testimony about a subject like eyewitness identification.

11. *See* Kesan, *supra* note 4, at 2038 ("As appellate courts repeatedly face the same sorts of scientific evidence, more uniform adjudication at the trial and appellate levels will result.").

change from one case to the next;[12] a scientific method is either reliable or unreliable. Thus, the validity of a scientific principle, technique, or process "is not the traditional case-specific adjudicative fact to which an appellate court defers to the trial court's findings."[13] Instead, the question of the validity of scientific information should be

> reviewed de novo by an appellate court, for "[t]he answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case. It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion."[14]

For example, a significant amount of research has been conducted on the question of whether smoking causes lung cancer. Litigants use this same research to prove their claims in a variety of smoking-related suits. Because the question of whether such studies are scientifically valid is not a case-specific factual inquiry, we should review rulings on the studies' admissibility de novo. In contrast, we should review a trial judge's assessment of the competency of a particular expert witness to render an opinion on the cause of a particular plaintiff's lung cancer for abuse of discretion.[15]

Based on these concerns, at least two of the states that have adopted *Daubert* as the standard for admissibility of scientific evidence apply a de novo standard of review to questions of scientific validity. In *Taylor v. State*,[16] the Oklahoma Court of Criminal Appeals adopted the *Daubert* standard and noted the need for independent appellate review:

> After ... considering the permanent impact of a trial judge's decision to admit novel scientific evidence, we find we should subject that decision to an independent, thorough review and not simply ask whether an abuse of discretion was committed.[17]

Similarly, in *Craddock v. Watson*,[18] the West Virginia Supreme Court adopted a hybrid standard of review for *Daubert* rulings:

> The trial court's determination regarding whether the scientific evidence is properly the subject of scientific, technical, or other specialized knowledge is a question of law that we review *de novo*. On the other hand, the relevancy requirement compels the trial judge to determine ... that the

12. *See* Gottesman, *supra* note 4, at 777–78 ("[T]he issue of general causation—whether substance A is capable of causing disease B—does not vary from case to case....").

13. Faigman et al., *supra* note 4, at 1821.

14. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 951 F.2d 1128, 1130 (9th Cir.1991) (quoting *Reed v. State*, 283 Md. 374, 391 A.2d 364, 367 (1978)), *vacated on other grounds*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Supreme Court recently decided that federal courts should review lower courts' *Daubert* rulings for abuse of discretion. *See General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). But the *Joiner* Court's holding on this point appears to rise exclusively out of a concern that courts of appeals were reviewing too strictly those district court rulings excluding scientific evidence on the grounds that the liberal thrust of the Federal Rules of Evidence favors admissibility. *See* 118 S.Ct. at 517. The Court made clear that decisions excluding and admitting evidence should be subject to the same standard of review. *See id.* The Court did not address the potential for inconsistency under an abuse of discretion standard or the possibility of a hybrid standard of review.

15. *See* Faigman et al., *supra* note 4, at 1822 (discussing the smoking/lung cancer example).

16. 889 P.2d 319 (Okla.Crim.App.1995). A few states have cited the Supreme Court's decision in *General Electric v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), for the proposition that *Daubert* rulings should be reviewed only for abuse of discretion. *See Smith v. Belle Bonfils Mem'l Blood Ctr.*, 976 P.2d 344, 347 (Colo.App. 1998); *Monette v. Clinch*, C8–98–329, 1998 WL 481892, at *1 (Minn.App. Aug.18, 1998); *Yamaha Motor Co. v. Arnoult*, 114 Nev. 233, 955 P.2d 661, 666 (1998); *DeVore v. Deloitte & Touche*, No. 01A01–9602–CH–00073, 1998 WL 68985, at *9 (Tenn.App. Feb.20, 1998). But the *Joiner* decision is not binding on Alaska courts. Moreover, the *Joiner* Court's holding on this point was based on a desire to stop courts of appeals from applying different standards of review to rulings excluding and admitting expert scientific testimony. *See supra* note 14. The Court did not address issues of consistency or the possibility of a hybrid standard of review. *See id.*

17. *Taylor*, 889 P.2d at 332 (footnote omitted).

18. 197 W.Va. 62, 475 S.E.2d 62 (1996).

scientific evidence "will assist the trier of fact to understand the evidence or to determine a fact in issue." W. Va. R. Evid. 702. Appellate review of the trial court's rulings under the relevancy requirement is under an abuse of discretion standard.[19]

The amici curiae in this case, Rex Lamont Butler & Associates and the Alaska Public Defender Agency, direct our attention to two Alaska cases, *Pulakis v. State*[20] and *State v. Contreras*,[21] in which Alaska appellate courts have exercised their independent judgment in determining the admissibility of certain scientific evidence such as polygraph examinations and hypnosis.[22] The court's response to the implication of these cases—that questions of scientific validity should be subject to a more stringent standard of review—is that such a view "does not adequately take account of the reality of the judicial process and the variable state of science."[23] The court cites the New Mexico case *State v. Alberico*[24] to argue that appellate courts might not have access to "all of the relevant, most recent data concerning the scientific method" at issue.[25] But appellate courts making an initial determination about the scientific validity of a theory or technique should have access to as much data as the trial court.[26] Additionally, because litigants in Alaska have an appeal as of right, we will have ample opportunity to revisit our decisions on scientific validity of a certain technique if new evidence or literature surfaces on the subject. And if a decision as to the reliability of scientific evidence were ever to hinge on an assessment of a particular witness's credibility, we could review such a decision for abuse of discretion under a hybrid standard.

In conclusion, this court should review rulings on the reliability of a general type of scientific evidence or method under a de novo standard and rulings on the evidence's relevance to a particular case for abuse of discretion. Such a hybrid standard of review would allow trial judges in Alaska considerable flexibility in making factual findings and assessments of witness competency and credibility while still preserving needed consistency in judicial decisions regarding the admissibility of scientific evidence. For this reason, I respectfully dissent from section III.D.1 of the court's opinion.

**19.** *Id.* at 67, 475 S.E.2d 62 (quoting *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171, 174 (1995)).

**20.** 476 P.2d 474 (Alaska 1970).

**21.** 674 P.2d 792 (Alaska App.1983), *rev'd on other grounds*, 718 P.2d 129 (Alaska 1986).

**22.** *See Pulakis*, 476 P.2d at 479 (polygraph examinations); *Contreras*, 674 P.2d at 799 (hypnosis).

**23.** Op. at 398.

**24.** Op. at 398–399 (quoting 116 N.M. 156, 861 P.2d 192 (1993)).

**25.** *Id.* (quoting 861 P.2d at 205).

**26.** Indeed, the *Alberico* court itself noted that, with respect to scientific theories about which "peer-reviewed literature or law review articles" have been written, appellate courts might be better suited because of lack of time pressure to make a determination of scientific validity. *See* 861 P.2d at 205–06.